The STATE of Ohio, Appellee,

v.

CONDON, Appellant.

[Cite as *State v. Condon*, 152 Ohio App.3d 629, 2003-Ohio-2335.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–020262.

Decided May 9, 2003.

630

632

Michael K. Allen, Hamilton County Prosecuting Attorney, and Judith Anton Lapp, Assistant Prosecuting Attorney, for appellee.

Sirkin, Pinales, Mezibov & Schwartz, L.L.P., H. Louis Sirkin and Jennifer M. Kinsley, for appellant.

GORMAN, Judge.

{¶ 1} The defendant-appellant, Thomas Condon, appeals from his conviction and sentence on eight counts of grossly abusing eight different corpses, violations of R.C. 2927.01(B). The statute prohibits anyone, without authorization of law, "to treat a human corpse in a way that would outrage reasonable community sensibilities." Acting without official permission or the consent of family members, Condon used the corpses as models for his photographic art, taking pictures of them, some of which he posed with props, as they awaited retrieval in the Hamilton County Morgue. Based largely upon the extreme emotional harm inflicted upon the families after they discovered what Condon had done, the trial court imposed the maximum one-year sentence on seven counts, finding them to be among the worst forms of the offense, and a lesser, six-month sentence on the remaining count. The court ordered the two maximum sentences on counts two and five and the six-month sentence on count six to be served consecutively, for a total period of imprisonment of two and one-half years.

{¶ 2} Condon presents twelve assignments of error. Besides alleging violations of his Fourth Amendment rights, prosecutorial misconduct, and errors in the conduct of the trial, Condon asserts that his unauthorized use of the corpses as objects of his photographic art was a protected form of artistic expression under the First Amendment. Further, he challenges the constitutionality of R.C. 2927.01(B), arguing that the statute is both overly broad under the First Amendment and void for vagueness under the Fourteenth Amendment. Should we reject his arguments addressing the constitutionality of the statute, he

challenges the weight and sufficiency of the evidence to support his convictions, and finally he challenges the sentence imposed by the trial court as overly harsh and contrary to law.

{¶ 3} We reject all of Condon's arguments under the First Amendment and the Due Process Clause, holding that the state could legitimately punish him, not for the content of the pictures, but for using the eight corpses as photographic models without any legal authorization and without first obtaining the consent of family members. In our view, his behavior was a sufficient affront to the dignity of the corpses, some of which he posed with props, to constitute their abuse under the statute. Furthermore, we hold that the statute is not unconstitutionally vague nor, given a reasonable construction, does it chill other forms of self-expression that do not involve abusing a corpse.

{¶ 4} We hold further that the police did not violate Condon's Fourth Amendment rights. Although we conclude that some of the prosecutor's remarks to the jury were improper and unprofessional, they did not give rise to reversible error, nor was the trial unfair. We hold, however, that the trial court erred by concluding that Condon's crimes violated a position of public trust and that they constituted the worst forms of the offense. Without diminishing their capacity to inflict extreme emotional harm on the families, Condon's crimes were certainly not among the worst examples of someone mistreating a corpse. We therefore exercise our authority under R.C. 2953.08(G)(2) to modify Condon's sentences and impose the minimum term of imprisonment on all counts. We cannot say, however, that the trial court erred by ordering the sentences on counts two, five and six to run consecutively. Condon's term of imprisonment is thus reduced, with credit for that part of the sentence he has already served, from thirty to eighteen months.

## FACTS

### *A. Prelude*

{¶ 5} In 1999, Ernest Waits, owner of Universal Media Consultants, and Condon, his associate and photographer, approached Terry Daly, office administrative assistant for the Hamilton County Coroner's office, concerning their interest in a video project explaining death to children. Waits also informed Daly about a project that Condon was separately interested in, a photographic essay called "life cycles" that sought to capture each life cycle of a human being, including death. Daly explained that he could not allow Waits to do an unofficial project but asked him if he would be interested in creating an autopsy video for educational and professional purposes.

{¶ 6} In March 1999, Hamilton County Chief Deputy Coroner Dr. Carl Parrott held a meeting with Daly, Waits, Rhonda Lindemann, the Hamilton County Coroner's office administrator, and Condon to discuss making the proposed autopsy-training video. Dr. Robert Pfalzgraf, Chief Deputy Coroner of Pathology, may have been present at this meeting. The participants discussed that the video was to be used in a "death investigation" seminar designed to provide a detailed account of a death investigation, starting with the death and ending with a prosecution. The meeting adjourned with Parrott stating that he would contact the prosecutor's office for an opinion regarding the legal ramifications of videotaping corpses—particularly whether consent of the families was needed.

{¶ 7} Parrott testified that they discussed one of Waits's personal projects at the meeting, but he did not recall discussing anything proposed specifically by Condon. Daly recalled that there was some initial discussion regarding whether Waits and Condon could do their projects as a "quid pro quo" if they worked on the training video. Waits testified that Condon's project was discussed at the meeting and that Condon had given Parrott material pertinent to his project. Waits recalled that he was told that, before going forward with any of the projects, the coroner's office needed to secure permission from the prosecutor's office. He also recalled being told that the coroner's office would maintain complete control over any photographic images.

{¶ 8} The coroner's office subsequently received an opinion from the prosecutor's office regarding the propriety of using morgue corpses for an autopsy-training video. Although the letter was not admitted into evidence, Daly testified that the letter stated that use of morgue corpses for the video would be permissible only with court approval and/or the consent of the next of kin. Daly also testified that Parrott had declined the requests of Waits and Condon to pursue their individual projects.

{¶ 9} In July 2000, Waits and Condon received permission to enter the morgue to determine what resources they would need to make the autopsy-training video. According to Parrott, Condon was granted only limited access to the morgue to view one autopsy and to take limited photographs of the autopsy for the sole purpose of assessing the cost of the autopsy-training video. Parrott testified that Condon was not given permission to take or keep photographs for his personal use.

{¶ 10} Condon then visited the morgue on at least two occasions with official authorization in August 2000. On the first visit, both Waits and Condon merely assessed the autopsy room. On the second visit, on August 16, Condon videotaped Pfalzgraf performing an autopsy on John Brady. Pfalzgraf testified that Condon also took still pictures of the procedure.

{¶ 11} Subsequent discussion ensued regarding the cost of the training video. Waits submitted an estimate of $10,000. Both Parrott and Lindemann testified that the coroner's office did not have the necessary funds in its budget and that consequently the project was put in abeyance.

{¶ 12} There was a welter of testimony regarding who knew what and when with regard to the cancellation of the video project. Parrott testified that he informed Lindemann that the autopsy-training video had been cancelled and that Condon no longer had permission to be in the morgue after the project was cancelled. Pfalzgraf testified that he was never informed that the videotape project had been discontinued or that Condon was not allowed in the morgue. Daly further testified that he informed Waits in September that the autopsy-training video project could not be completed based on the budget set for 2000 and 2001. Daly testified that he had informed Condon in October that the autopsy-training video project would not go forward.

*B. Life Cycles*

{¶ 13} After October 2000, with the autopsy-training video project cancelled or on hold, Condon no longer had official authorization to be in the morgue for any purpose, let alone taking pictures of morgue corpses. Nonetheless, evidence was presented that after October 2000, Condon continued to visit the morgue and continued to take pictures of morgue corpses, apparently for the purposes of his own pet project, "life cycles," for which, as noted, he had been officially denied permission. During this period of unauthorized entry, he took pictures of the bodies of Adam Richardson, Perry Melton, Thomas Senteney, Debbie Beckman, Barbara Sowards, and Jonathan Frith. The pictures of Frith were apparently taken during the young boy's autopsy. In some of the pictures, Condon had placed props on or near the body, while some of the pictures were simply of the body lying in a state of repose.

{¶ 14} Finally, on January 7, 2001, Tyrone Smith and Clyde Gamble, both morgue attendants, saw Condon come into the morgue in the afternoon. According to Smith, he, Gamble, and Dr. Jonathan Tobias, a junior pathologist, were alone in the morgue when Condon came in with his camera equipment. According to Gamble, Condon talked with Tobias about the smell coming from an autopsy Tobias was performing at the time and then entered a cooler where cadavers were stored in body bags. Gamble observed Condon bring in lighting equipment. Smith and Gamble testified that Condon spent one to one and one-half hours in the cooler. Gamble testified that Condon came out of the cooler a number of times to get paper towels. At some point, Smith entered the cooler to get a body for a funeral home, and he saw Condon standing by Christina Folchi's body with photographic lights positioned around it. Smith testified that Condon

appeared to be taking pictures of Folchi, a nineteen-year-old accident victim, and that her body was completely exposed. Subsequent pictures of the body taken by Condon and obtained by the police showed Folchi's body with a catheter tube in her incision, cloth over her eyes, objects on her body (a snail shell, a "Will" card, and sheet music, some of which were positioned around her pubic area), a book by her side, and a key in her mouth.

{¶ 15} On January 8, 2001, Brent Erke was working at Robin Imaging Photography Lab ("Robin Imaging") when he noticed some "questionable" black-and-white film being reproduced into a negative format. Erke was shocked and mortified by the negatives and notified his boss and owner, William Johnson, who examined the negatives and then called the police. Johnson confirmed that the film had been brought in by Condon. At the request of the police, Johnson made a copy of the negatives and returned the original set to Condon.

{¶ 16} Police obtained a warrant to search Condon's studio, located in Hamilton County. Props identical to those used in some of the photographs were discovered, as well as both negatives and developed photographs depicting cadavers with props placed next to the bodies. Condon's car was also searched, and the police recovered other props used in the photographs.

{¶ 17} The police were able to identify the bodies pictured in the negatives and photographs recovered from Condon. Records were introduced into evidence demonstrating the date and time each body was brought into the morgue and released. With the exception of the Brady corpse, none of the bodies had been in the morgue at a time Condon was authorized to be in the facility.

{¶ 18} Cal Kowal, a professor of art at the Cincinnati Museum Art School, testified on Condon's behalf. He testified that photography was an "art form." Kowal stated that, in traditional photography, the artist worked first with a negative to create his work. He stated that, historically, art dealt with the body and that there had always been representation of corpses. According to Kowal, artists did take pictures of corpses. He stated that Andres Serrano had a show of photographs taken in a morgue and that Joel–Peter Witkin worked with body parts. In Kowal's opinion, Condon's project on "life cycles" was a "valid concept."

## FIRST AND FOURTEENTH AMENDMENT ISSUES

### *A. Freedom of Expression*

{¶ 19} Condon contends in his third assignment of error that the trial court erred in overruling his motion to dismiss the indictment, when his conduct in taking the photographs was protected by the First Amendment. According to Condon, the photographs were a form of artistic expression, and thus the manner

in which he obtained them was constitutionally immune from criminal prosecution. We disagree.

{¶ 20} Initially it is important to make clear that this case is not about the images themselves. R.C. 2927.01(B) is not a blanket proscription against taking pictures of dead people. If it were, the statute would be content-based and unconstitutional. The First Amendment prohibits the government from restricting expression because of its message, ideas, subject matter, or content. See *Hudgens v. Natl. Labor Relations Bd.* (1976), 424 U.S. 507, 520, 96 S.Ct. 1029, 47 L.Ed.2d 196.

{¶ 21} Had Condon been able, therefore, to devise a means of obtaining either legal authorization or the consent causa mortis of his subjects (or perhaps even the posthumous consent of their families), he would have been free to express himself by taking the pictures that he did. Condon, however, did not receive authorization, nor did he receive the consent of the families of those whose bodies he chose to photograph. After consulting with the prosecutor's office, morgue officials denied his request for permission to use morgue bodies for his "life cycles" project. There is absolutely no evidence to suggest that he ever approached the families of the deceased, perhaps because he feared the sharpness of their reply. Rather, Condon took it upon himself, knowing that he did not have permission, to enter the morgue without authorization and to turn it into his photography studio, randomly selecting corpses and using their lifeless forms for his subjects, even going so far as to plant symbolic props on several in an apparent effort to enhance his artistic message. It was this conduct by Condon—the unauthorized treatment of bodies of others' loved ones as objects to be photographed for his personal art project—that the state sought to punish.

{¶ 22} Contrary to Condon's argument, the First Amendment did not grant him a right to abuse a corpse for the purpose of his art. (Employing the same logic, Condon would have a perfect right to dig up bodies from their graves if he decided his next project was "death cycles," a study of the human body decomposing.) Concededly, the United States Supreme Court has recognized that the protection of the First Amendment "does not end at the spoken or written word * * *[and] that conduct may be 'sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments.'" *Texas v. Johnson* (1989), 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342, quoting *Spence v. Washington* (1974), 418 U.S. 405, 409, 94 S.Ct. 2727, 41 L.Ed.2d 842. But the Court has also recognized that "virtually any prohibited conduct can be performed for an expressive purpose—if only expressive of the fact that the actor disagrees with the prohibition." *Barnes v. Glen Theatre Inc.* (1991), 501 U.S. 560, 576, 111 S.Ct. 2456, 115 L.Ed.2d 504 (Scalia, J., concurring). Consequently, the Court has rejected the view that a " 'limitless variety of conduct can be

labeled "speech" whenever the person engaging in the conduct intends thereby to express an idea.' " *Johnson,* supra, at 404, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342, quoting *United States v. O'Brien* (1968), 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672.

{¶ 23} Moreover, even conduct that is sufficiently imbued with communicative elements to fall under the First Amendment is subject to time, place, and manner restrictions. As this court has noted, "The First Amendment has never conferred an absolute right to engage in expressive conduct whenever, wherever or in whatever manner a speaker may choose." *Cincinnati v. Thompson* (1994), 96 Ohio App.3d 7, 15–16, 643 N.E.2d 1157, citing *Greer v. Spock* (1976), 424 U.S. 828, 836, 96 S.Ct. 1211, 47 L.Ed.2d 505, and *Adderley v. Florida* (1966), 385 U.S. 39, 48, 87 S.Ct. 242, 17 L.Ed.2d 149.

{¶ 24} In *Thompson,* this court held that abortion protestors had no constitutionally protected right to trespass upon private property to express their views. Similarly, this court has held that a person, although he or she may verbally express disapproval and may even curse at a police officer, has no right to obstruct the officer from giving parking tickets by running ahead of the officer to feed a meter. See *State v. Stayton* (1998), 126 Ohio App.3d 158, 709 N.E.2d 1224. And, more recently, this court has held that an adult male may be convicted of disorderly conduct by following a young teenage girl around a health facility, frightening her by making sexually inappropriate comments. See *State v. Bailey* (June 21, 2002), 1st Dist. No. C–010641, 2002 WL 1343466. In each of these cases, we rejected the argument that the First Amendment rendered the proscribed behavior immune from criminal prosecution.

{¶ 25} As a further point of clarification, it should also be pointed out that this case is not concerned solely with photographing dead people without the permission of the next of kin. A photojournalist may take pictures of the dead—on the battlefield, for example, or as the result of a public accident or tragedy, such as the horrible spectacle of death surrounding the attack on the World Trade Center—to document a newsworthy event. It is generally understood that such photographic documentation is a form of protected speech and a part of the freedom of the press that cannot subject the photographer to either criminal or civil liability, no matter how shocking to the sensibilities of the family. See *Bremmer v. Journal–Tribune Publishing Co.* (1956), 247 Iowa 817, 76 N.W.2d 762. As noted by Prosser, "It seems to be generally agreed that anything visible in a public place can be recorded and given circulation by means of a photograph, to the same extent as by a written description, since this amounts to nothing more than giving publicity to what is already public and what anyone present

would be free to see." Prosser, Handbook of the Law of Torts (4 Ed.1971), Section 117, 811.[1]

{¶ 26} Here, however, the corpses were not in a place open to public inspection. A morgue is not a lending library or a museum. It is a place of private repose, not of public display. The public expects those in charge to ensure that the bodies of their loved ones are not unnecessarily disturbed or gratuitously handled or examined. Condon did not merely document photographically what the public was free to see, but instead entered the morgue without permission and took pictures of what the public was not allowed to see. Some of the bodies he even manipulated and posed with props for the sake of his artistic enterprise.

{¶ 27} And, finally, it should be emphasized that we are not concerned with the act of merely having pictures of corpses in one's possession. An art museum or gallery does not, for example, abuse a corpse by hanging a picture of it for public display, no matter how grisly or offensive the image. This case is about the manner in which Condon took the photographs, and his treatment of the corpses in doing so; it is no way a prosecution based upon the message he sought to express.

{¶ 28} Condon's third assignment of error is overruled.

*B. Vagueness*

{¶ 29} In his fourth assignment of error, Condon challenges the constitutionality of R.C. 2927.01 by asserting that it is impermissibly vague. He argues that the plain language of the statute fails to provide the average person with adequate notice of the prohibited conduct.

{¶ 30} A criminal statute violates the vagueness doctrine under the Due Process Clause of the Fourteenth Amendment if it does not contain "ascertainable standards of guilt." *State v. Young* (1980), 62 Ohio St.2d 370, 16 O.O.3d 416, 406 N.E.2d 499. In *State v. Glover* (1984), 17 Ohio App.3d 256, 17 OBR 524, 479 N.E.2d 901, the Eighth Appellate District held that R.C. 2927.01(B) does provide such ascertainable standards. The court observed that "[a] criminal statute is not void for vagueness simply because it requires a person to conform to an imprecise but comprehensible normative standard," but only when "it specifies no standard of conduct at all." Id. at 258, 17 OBR 524, 479 N.E.2d 901. The *Glover* court reasoned that while R.C. 2927.01 does not define every word within its ambit, the words contained in the statute—"treat," "human corpse," "way," "outrages," and "sensibilities"—are generally understood by persons of common

1. It is conceivable, however, that even a photojournalist could be found guilty of abusing a corpse—even one found in a public place—under R.C. 2927.01 if he or she manipulated the body for the purpose of heightening the visual effect of a photograph.

intelligence. See id. Thus, the court concluded that the statute is not void for vagueness and that it simply provides a standard of conduct based on contemporary community mores. See id.

{¶ 31} The Second and Sixth Appellate Districts, it should be pointed out, have followed the *Glover* decision. See *State v. Hopfer* (1996), 112 Ohio App.3d 521, 557, 679 N.E.2d 321; *State v. Gardner* (1989), 65 Ohio App.3d 24, 582 N.E.2d 1014. We are also persuaded by its reasoning. Community mores concerning the proper treatment of a corpse are not, in our view, esoteric or otherwise difficult to discern. Irrespective of one's religious views, and even if one is an atheist or an agnostic, it is almost universally understood that the bodies of the dead are to be treated with the utmost respect and in a manner that will not inflict any more emotional pain upon "the wounded hearts of friends and mourners." *Commonwealth v. Browne* (1976), 74 Pa. D. & C.2d 724, 730, 1976 WL 17417. Indeed, there is in human beings an ingrained sense that the dead are not to be trifled with. It is incredible that Condon would maintain that he had no inherent appreciation that his treatment of the corpses violated community mores. Aside from principles of fundamental decency, the fact that the project had been rejected by the coroner's office should have alerted him that use of the county morgue for his art project had been officially disapproved. To be sure, the unauthorized manner with which he then proceeded indicates that he well understood that his use of the corpses as art objects was contrary to societal rules of accepted behavior.

{¶ 32} Based upon the foregoing analysis, we conclude that the terms of R.C. 2927.01(B) are sufficiently explicit to provide notice of what conduct is prohibited under the statute. Accordingly, we hold that R.C. 2927.01(B) is not unconstitutionally vague.

*C. Overbreadth*

{¶ 33} Also in his fourth assignment of error, Condon argues that R.C. 2927.01 is capable of having a chilling effect because its reference to community mores, without further delineation, may lead citizens to steer clear of permitted behavior. The argument is not fully developed and is treated as ancillary to Condon's other arguments that R.C. 2907.01 inhibits free speech and is impermissibly vague. As we have already discussed, the statute is content-neutral and designed to target a person's conduct in treating a corpse in a manner that the community finds not only wrong, but also outrageous. Such norms are generally understood. The average person rightfully appreciates that when he comes into contact with the dead, he must be unusually circumspect in their treatment and that any disrespectful behavior, if it goes too far, may run afoul of the law. The

entire purpose of R.C. 2927.01 is to ensure that people, if they have not already learned, will act with reverence when dealing with the bodies of the dead.

{¶ 34} We cannot conceive, moreover, that R.C. 2927.01 has significant potential for inhibiting permitted behavior. The official comments to the section make clear that it does not include conduct authorized by law, such as a mandatory autopsy or the exhumation of a dead body on court order. Furthermore, the culpable mental state required for a violation of R.C. 2927.01(B) is recklessness. See *State v. Glover,* supra, at 257, 17 OBR 524, 479 N.E.2d 901. R.C. 2901.22(C) defines this mental state as follows: "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature." This definition ensures against someone innocently or naively committing the crime of abuse of a corpse. In order to convict, the state must prove that the defendant knew that his treatment of a corpse was likely to cause outrage to the community and that he nonetheless "perversely" disregarded that risk.

{¶ 35} A court is under a duty to give a statute, whenever possible, a reasonable construction that will render it constitutionally definite. See *State v. Dorso* (1983), 4 Ohio St.3d 60, 61, 4 OBR 150, 446 N.E.2d 449, citing *United States v. Harriss* (1954), 347 U.S. 612, 618, 74 S.Ct. 808, 98 L.Ed. 989; *State v. Norris* (2002), 147 Ohio App.3d 224, 769 N.E.2d 896. This being so, and given that the statute requires the culpable mental state of recklessness, we do not perceive that R.C. 2927.01 has a potential chilling effect on otherwise legal behavior. We therefore reject Condon's argument that the statute is overly broad.

{¶ 36} Condon's fourth assignment of error is overruled.

FOURTH AMENDMENT ISSUES

{¶ 37} In the fifth assignment of error, Condon contends that the trial court erred when admitting items seized under an invalid search warrant. Condon contends that the affidavit in support of the warrant was invalid because it contained false and conclusory statements and insufficient indicia of probable cause. In particular, Condon argues that the officer's statements in the affidavit that Condon was engaged in pandering obscenity were misleading and conclusory.

{¶ 38} An affidavit supporting a warrant enjoys a presumption of validity. See *State v. Roberts* (1980), 62 Ohio St.2d 170, 16 O.O.3d 201, 405 N.E.2d 247. When challenging the accuracy of statements made in a supporting affidavit, the defendant must provide "an offer of proof which specifically outlines the portions of the affidavit alleged to be false, and the supporting reasons for the

defendant's claims. This offer of proof should include the submission of affidavits or otherwise reliable statements, or their absence should be satisfactorily explained." Id. at 178, 16 O.O.3d 201, 405 N.E.2d 247. Furthermore, as this court has held, the defendant is required to show that the false statement has been made either knowingly or intentionally, or with reckless disregard for the truth, in a manner that would mislead the court. See *State v. Green* (Nov. 14, 1979), 1st Dist. No. C–790012, citing *Franks v. Delaware* (1978), 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667.

{¶ 39} As the state points out, the affidavit in support of the search warrant in this case not only alleged the crime of pandering obscenity, but also the crimes of abuse of a corpse and use of a minor in nudity-oriented material. Attached were photographs depicting nudity in the context of autopsies and crime-scene photographs. We agree with the state that Condon presented insufficient evidentiary material to support his claim that the officer requesting the affidavit made a false statement either knowingly, intentionally, or with a reckless disregard for the truth. Absent evidence pointing to deliberate duplicity, it appears that the officer, struggling with the unusual nature of the photographs at the preliminary stage of the investigation, was merely being overly inclusive of the crimes he suspected were involved when he was preparing the affidavit.

{¶ 40} Condon also argues that the affidavit in support of the search warrant failed to establish probable cause because it failed to link the crimes and the evidence to his studio. When determining the sufficiency of probable cause in an affidavit submitted in support of a search warrant, an issuing magistrate must make " 'a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *State v. George* (1989), 45 Ohio St.3d 325, 544 N.E.2d 640, paragraph one of the syllabus, quoting *Illinois v. Gates* (1983), 462 U.S. 213, 238–239, 103 S.Ct. 2317, 76 L.Ed.2d 527. Courts give great deference to a judge's probable-cause determination. Id. at paragraph two of the syllabus. With these principles in mind and considering the officer's extensive factual recitation in the affidavit, we conclude that ample information existed to support a finding that there was probable cause for the issuance of a warrant. Thus, we hold that the items seized from Condon's studio were not obtained illegally. The fifth assignment of error is therefore overruled.

## PRETRIAL ISSUES

### *A. Exculpatory Evidence*

{¶ 41} We next address Condon's asserted errors arising from pretrial procedures and decisions. In his second assignment of error, Condon maintains

that the trial court erred by failing to compel disclosure of material exculpatory evidence. In particular, Condon asks this court to review the opinion letter from the Hamilton County Prosecutor's office to determine its relevance and to overturn the decision of the trial court denying disclosure of the letter if we deem it to be material.

{¶ 42} At a pretrial hearing on the motion, the trial court made an in camera inspection of the opinion letter, which was dated November 2, 1999. The trial court denied Condon's motion, finding that "the opinion is not relevant, it's not admissible in evidence, nor does [it] authorize any of the alleged acts charged of the defendants."

{¶ 43} Under Crim.R. 16(B)(1)(f), the state has an obligation to supply the defense with evidence that is favorable to the accused and material to either guilt or punishment. A defendant's due-process right to a fair trial is violated, and reversal is warranted, when the prosecution withholds exculpatory evidence in a criminal proceeding. See *Brady v. Maryland* (1963), 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215; *State v. Johnston* (1988), 39 Ohio St.3d 48, 529 N.E.2d 898, paragraph four of the syllabus. To determine that evidence is material for due-process purposes, there should be a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *State v. Johnston,* supra, paragraph five of the syllabus. A "reasonable probability" is a probability sufficient to undermine the "confidence in the trial result obtained without the exculpatory evidence." *State v. Jackson* (1991), 57 Ohio St.3d 29, 33, 565 N.E.2d 549, citing *United States v. Bagley* (1985), 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481. See, also, *State v. Johnston,* supra.

{¶ 44} Here, the prosecution asked the trial court for a determination of the materiality of the letter, and thus we are not confronted with a case where the prosecution attempted to conceal its contents from the court. The letter was proffered, and therefore we are able to review it. The letter addressed the propriety of the coroner's office producing an autopsy-training video and whether, as part of this officially authorized project, it would be necessary for the coroner's office first to obtain the consent of the next of kin. The issue of consent under these circumstances, however, did not arise in the context of R.C. 2927.01(B), which proscribes the abuse of a corpse, but under R.C. 2741.02, an entirely different statute that protects an individual's persona against its misappropriation for commercial purposes during the individual's lifetime or for a period of sixty years after death. The prosecutor's office advised that if the training video was reproduced and sold for commercial purposes, then it would be necessary to obtain the consent of the next of kin pursuant to R.C. 2741.02. Conversely, the prosecutor's office also advised that if the training video did not violate the

restrictions on commercial use, then the video would be exempt from the provisions of R.C. Chapter 2741. The letter also advised that, given the issue of commercial appropriation of a corpse's identity, any autopsy-training video had to take precautionary steps to conceal the subject's identity. The letter stated, "Steps should be taken to conceal the physical features and other identifying traits such as: tattoos, amputations, noticeable scarring, glass eyes, etc."

{¶ 45} We conclude that the opinion letter did not constitute material evidence pertaining to Condon's guilt or innocence for abusing corpses under R.C. 2927.01. The letter was concerned with an entirely different matter under an entirely different statute: commercial appropriation of an individual's persona in an officially authorized autopsy-training video under R.C. 2741.02. The letter was not favorable to Condon's defense, nor was there a reasonable probability that the result of the proceeding would have been different had the letter been disclosed. Indeed, it is likely that the letter, if presented to the jury, would have served only one purpose: to confuse the issues, creating the false impression in the jurors' minds that Condon was somehow charged with the intellectual-property crime of appropriating the corpses' personas for commercial purposes rather than abusing them by treating them as models for his photographic art. To the extent that the letter stressed the importance of taking steps to conceal the identity of any corpse used in a training video, such confusion may have significantly damaged Condon's defense since he took absolutely no steps to conceal the identify of the corpses that he photographed. The trial court correctly concluded, therefore, that the opinion letter need not have been disclosed under *Brady,* supra, because it was neither material nor exculpatory, and that it was excludable under Evid.R. 403(B) given its lack of relevance and potential for confusion.

### B. *Conflict of Interest*

{¶ 46} In the seventh assignment of error, Condon maintains that the trial court erred in failing to dismiss the indictment because the prosecutor was acting under a conflict of interest.[2] Condon claims that he was denied due process because the prosecutor improperly appeared before the grand jury seeking an indictment against Condon two weeks after a civil lawsuit had been brought by the families of the deceased victims against certain Hamilton County employees, including Tobias, and Condon. Condon claims that, because the Hamilton County Prosecutor's Office was required by law to represent county employees in the

---

2. Condon and Tobias jointly filed a separate motion to disqualify the prosecutor's office under Crim.R. 6(D). The trial court similarly overruled it. Based on Condon's assignment on appeal, we do not address the propriety of overruling this motion.

civil lawsuit, a conflict existed when the prosecutor's office indicted Condon and Tobias for crimes relating to the civil lawsuit.

{¶ 47} Traditionally, where there is a potential conflict of interest, the trial court must hold an evidentiary hearing and issue findings of fact when determining if the improper appearance can be overcome. See *Kala v. Aluminum Smelting & Refining Co., Inc.*, 81 Ohio St.3d 1, 1998-Ohio-439, 688 N.E.2d 258, syllabus. But because the relationship between attorneys in a government office is different from the relationship between those in a private firm, the mere appearance of impropriety in a government office is not sufficient in and of itself to warrant vicarious disqualification. See *State v. Frederick,* 3d Dist. No. 13–01–16, 2001-Ohio-2315, 2001 WL 1432039, citing *State v. Murphy* (Nov. 15, 1988), 3rd Dist. No. 9–87–35, 1988 WL 126748 (quoting ABA Committee on Professional Ethics Formal Opinion 342, 62 A.B.A.J. 517).

{¶ 48} Here, the trial court held a hearing on the motion to dismiss the indictment. At the hearing, Condon presented no additional evidence supporting his motion, but rested solely on the fact that the civil law suit had been filed on January 26, 2001, against Hamilton County employees, and that the suit included Condon and Tobias. After considering the arguments, the trial court overruled Condon's motion but ruled that Condon retained the right to submit further written evidence to support his claim of an actual conflict. At no time prior to trial did Condon offer supplemental proof. In the absence of such supplemental proof in the record, we conclude that the trial court correctly ruled that Condon had not established grounds for a vicarious disqualification of the prosecutor's office based upon a conflict of interest.

## TRIAL ISSUES

### *A. Weight and Sufficiency*

{¶ 49} In the ninth assignment of error, Condon challenges the weight and sufficiency of the evidence. When reviewing the sufficiency of the evidence to support a criminal conviction, we must examine the evidence admitted at trial in the light most favorable to the prosecution and determine whether such evidence could have convinced any rational trier of fact that the essential elements of the crime were proven beyond a reasonable doubt. See *State v. Thompkins,* 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541; *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, superseded by state constitutional amendment on other grounds in *State v. Smith,* 80 Ohio St.3d 89, 1997-Ohio-355, 684 N.E.2d 668. In deciding if the evidence is sufficient, we neither resolve evidentiary conflicts nor assess the credibility of the witnesses, as both are functions reserved for the trier of fact.

See *State v. Willard* (2001), 144 Ohio App.3d 767, 777–778, 761 N.E.2d 688. In a weight-of-the-evidence challenge, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and decide whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created a manifest miscarriage of justice. *Thompkins,* supra, at 387, 678 N.E.2d 541. A new trial should be granted only in exceptional cases where the evidence weighs heavily against conviction. Id.

*1. Sufficiency—Abuse of a Corpse, Lack of Authorization*

{¶ 50} As noted, R.C. 2927.01(B) provides that "[n]o person, except as authorized by law, shall treat a human corpse in a way that would outrage reasonable community sensibilities." The comment to R.C. 2927.01 states that the legislature intended the statute to cover "conduct formerly prohibited by specific prohibitions against grave robbing and unlawful dissection of a corpse." The comment continues, "[R.C. 2927.01(B) ] also includes other kinds of conduct, such as copulating with or otherwise mistreating a corpse. This section does not include conduct authorized by law, such as a mandatory autopsy or the exhumation of a dead body on court order." The culpable mental state required for a violation of R.C. 2927.01(B), as we have discussed, is recklessness.

{¶ 51} Condon argues that taking photographs of a corpse for artistic purposes is insufficient evidence of "abuse" as that term is used in R.C. 2927.01(B). Additionally, even assuming that it is sufficient, he argues that, with respect to count five, the state presented insufficient evidence that he took the photograph of Melton. Further, he argues that the state did not present sufficient evidence that he acted without legal authorization.

{¶ 52} We disagree with Condon that the taking of unauthorized photographs of a corpse cannot legally rise to the level of abuse. The statute clearly proscribes a broad range of conduct provided that it is so inappropriate and insensitive as to outrage community standards. The statute does not require that the corpse be physically abused. Treating the corpse as a mere object, as a model to be manipulated or exploited for its shock value, can suffice under certain circumstances. Here, Condon, having never received official permission for his own project, and having lost his one legitimate reason for being in the morgue after the autopsy-training video was cancelled, nonetheless continued to visit the morgue after October 2000 and to take pictures of the corpses for his own gratuitous purposes. He exposed the eight corpses to the harsh glare of the lights and camera without any apparent regard for their sanctity. One, a young boy, was photographed while the body was apparently undergoing an autopsy. Others he objectified by placing upon their bodies props to enhance whatever artistic message he wished to convey. We hold that such unauthorized and

disrespectful treatment of the bodies was a sufficient affront to dignity for the jury to determine that there had been abuse of a corpse.

{¶ 53} As for the evidence that Condon took the pictures, we note that the photographs generally fell into two categories: (1) photographs of Richardson, Folchi, Brady, Senteney, Beckman, and Sowards with props placed on or near their bodies, and (2) photographs of Richardson, Folchi, Brady, Senteney, Beckman, Sowards, Melton, and Frith taken while in the county morgue.

{¶ 54} The evidence presented at trial was sufficient to establish that Condon took the photographs of Richardson, Folchi, Brady, Melton, Senteney, Frith, Beckman, and Sowards at the morgue and had them developed in print or negative format. Direct evidence was presented that Condon took photographs of Folchi and Brady.[3] Indirect evidence further established that Condon took the photographs of Richardson, Melton, Senteney, Frith, Beckman, and Sowards.[4]

{¶ 55} Sufficient testimony was also presented that Condon took the photographs without authorization from the coroner's office. Parrot testified that Condon was never given permission to pursue his "life cycles" project. Both Parrott and Daly testified that Condon only had permission to come into the morgue on two occasions—once to view the space and once to view an autopsy for the purpose of developing an estimate for the coroner's office on the instructional video. Parrott testified that Condon was given only limited access to the morgue. Condon's access to the morgue was supposed to be used for establishing an estimate of how much it would cost to film an autopsy-training video that was to be used by the coroner's office for educational purposes. With respect to the photographs of Brady, the evidence established that Condon was given permission to view, videotape, and photograph Brady's autopsy on August 16, 2000. Condon did not, however, have permission to photograph Brady for artistic purposes or his personal use, as was suggested by the content of some of the images and the fact that the photographs were later found in Condon's private possession.

---

3. Smith and Gamble testified that Condon had spent one to one and one-half hours in the cooler, unattended by a coroner, taking pictures of Folchi on January 7, 2001. Daly testified that Condon viewed the autopsy of Brady, and Pfalzgraf testified that Condon had taken still photographs of Brady.

4. Five pictures of Richardson, fifteen pictures of Frith, two pictures of Beckman, two pictures of Senteney, one picture of Brady, and three pictures of Melton were found fully developed in print format at Condon's office. And negatives of Richardson, Folchi, Brady, Senteney, Frith, Beckman, and Sowards were found either in Condon's office or at Robin Imaging. For the purpose of litigation, the police made those negatives into prints. One of Frith's negatives was also found in Condon's enlarger at his office.

{¶ 56} As noted, the evidence firmly established that Condon continued to take pictures at the morgue even after he had been informed that the autopsy-training video project had been cancelled, and that he consequently no longer had permission to be at the morgue. The corpses of Melton, Richardson, Senteney, Frith, Beckman Folchi and Sowards were kept at the morgue between November 2000 and January 2001, well after the time Condon's access to the morgue had been revoked.

{¶ 57} Finally, family members testified that they had not given Condon authorization to take photographs of the corpses of Richardson, Folchi, Brady, Melton, Senteney, Frith, Beckman, or Sowards. Lindemann testified that family consent forms to photograph the corpses did not appear in the coroner's files maintained for each corpse. We note that, while lack of family authorization is not an element of abuse of a corpse, arguably, permission from the family, if it existed, would have exonerated Condon, at least in the jurors' minds, as his behavior may not have been perceived as either outrageous or reckless if done with the family's approval.

{¶ 58} In sum, we hold that the state presented sufficient evidence to establish that Condon, acting without any legal authority, treated the eight bodies in such a manner as to constitute their abuse under R.C. 2927.01.

*2. Sufficiency—Culpable Mental State*

{¶ 59} Condon also argues that the state failed to produce sufficient evidence that he acted recklessly and without knowledge that his photographs would outrage reasonable community sensibilities. We disagree.

{¶ 60} As we have previously noted and discussed, R.C. 2927.01 required the state to demonstrate that, in treating the corpses as he did, Condon perversely disregarded a known risk that his behavior was likely to cause a certain result—in this case, a sense of outrage among the community. As we have also noted, every citizen is generally aware of community strictures regarding the treatment of the dead. Such strictures are part of a shared sense of humanity. Frankly, we find it difficult to believe that Condon can seriously argue that he had no sense that his unauthorized use of the bodies of other people's loved ones for his art project posed a risk of causing outrage, not only among the families, but in the community at large. Even an overblown sense of the importance of one's own art could not make one oblivious to the impropriety of treating morgue corpses as objects to be freely exploited and posed for their photographic value.

{¶ 61} Condon also argues that the fact that he was allowed access to the morgue to take certain autopsy photographs and to pass a number of security checkpoints to gain admittance established that he did not perversely disregard a known risk that his conduct would outrage community sensibilities. We see this

argument, at best, as a challenge to the weight of the evidence. We also note that Condon's authorization to be in the morgue for other legitimate purposes would surely not have logically precluded a finding that he acted recklessly in taking the pictures for which he had no authorization and had, in fact, been refused permission.

{¶ 62} Finally, Condon argues that the testimony of Professor Cal Kowal, who stated that death and corpses have been proper subjects of photography since the beginning of the art form, precluded a finding that he acted recklessly. According to Condon, "[b]ecause other photographers have previously photographed corpses including corpses that were posed with inanimate objects, without prosecution, [he] could not have conceived that his photography would have outraged the community." Again, we consider this an argument that goes to weight rather than sufficiency. Further, we reject the notion that artistic license replaces common sense. As a member of the community in which he lived, Condon could be expected to have a basic understanding of the community mores respecting the proper treatment of corpses. This presumed understanding, the fact that his project had been turned down by morgue officials, and the unauthorized manner in which he set about his work, all contributed to the evidence that he acted recklessly.

{¶ 63} There was, furthermore, ample testimonial evidence of the outrage provoked by Condon's actions. Dr. Parrott testified that Condon's pictures were "deplorable." Lindemann testified that Condon's pictures were "offensive" and "disrespectful." David Lovett, the police officer who retrieved the photographic negatives from Robin Imaging, testified that he was "shocked" by the photographs. Erke testified that he was "shocked" and "mortified" by the negatives he saw at Robin Imaging. Johnson testified that the photographs were "disturbing." A police officer who conducted the search of Condon's studio testified that the photographs and negatives made her "nauseous." Craig Senteney testified that all of the photographs were terrible. Richard Beckman testified that the photographs of his sister were disturbing. Robert Martineck testified that he saw the photographs of Folchi and thought they were not proper.

{¶ 64} In sum, we hold that there was sufficient evidence presented that Condon had acted recklessly in treating the corpses as he did.

*3. Weight of the Evidence*

{¶ 65} Condon provides no additional argument in support of his claim challenging the weight of the evidence. Nevertheless, having reviewed the record, we are convinced that the jury did not clearly lose its way in resolving the conflicts in the evidence. With respect to Condon's perceived authorization to take the photographs, the jury was entitled to find that the testimony of the

state's witnesses, including Dr. Parrott, Daly, and Lindemann, was more credible than the testimony of Waits. And while Waits testified that he was never informed that his own personal project or Condon's "life-cycles" project could not be undertaken, the overwhelming evidence established that Condon was never given permission to pursue his personal project. Further, after viewing all of the evidence and critically examining the photographs, the jury found that the corpses of Richardson, Folchi, Brady, Melton, Senteney, Frith, Beckman, and Sowards had been recklessly treated in a way that offended community sensibilities. Because the weight to be given to the evidence and the credibility of the witnesses were primarily for the trier of fact, see *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus, we cannot say that, as a matter of law, the jury improperly weighed the evidence. Having found that no manifest miscarriage of justice, we overrule the ninth assignment of error.

*B. Prosecutorial Misconduct*

{¶ 66} Next, we address Condon's first assignment of error, which relates to prosecutorial misconduct. In order to reverse a conviction based on prosecutorial misconduct, the alleged misconduct must have deprived the defendant of a fair trial. See *State v. Fears,* 86 Ohio St.3d 329, 332, 1999-Ohio-111, 715 N.E.2d 136; *State v. Maurer* (1984), 15 Ohio St.3d 239, 266, 15 OBR 379, 473 N.E.2d 768. The prejudicial effect of the alleged misconduct must be considered in the context of the entire trial and not simply from the immediate context in which the misconduct occurred. See id. Condon vigorously complains about the following remarks made by the prosecution during closing argument:

{¶ 67} "There are some things that scream out to be addressed and I'm going to start with some of [Condon's defense attorney's] comments.

{¶ 68} "First of all, he has the audacity to come into this courtroom in front of you, in front of the relatives of these victims, and refer to this *bullshit project as art,* is an insult to the victims and especially the families." (Emphasis supplied.)

{¶ 69} Condon's attorney objected to the comments. The trial court overruled the objection but gave the jury a general curative instruction that the remarks of counsel were not to be considered evidence. The prosecutor followed by stating, "It's outrageous that they would even consider calling that art work." No objection was raised.

{¶ 70} The prosecution is afforded wide latitude to highlight the relative strengths of its case and the relative weakness of the defense, but this latitude does not extend as far as letting the prosecution denigrate the role of defense counsel. See *State v. Keenan* (1993), 66 Ohio St.3d 402, 406, 613 N.E.2d 203; *State v. Hart* (1994), 94 Ohio App.3d 665, 671–672, 641 N.E.2d 755. A

prosecutor may not denigrate counsel by insinuating that the defense is hiding the truth. See *State v. Smith* (1998), 130 Ohio App.3d 360, 369, 720 N.E.2d 149, quoting *State v. Hart* (1994), 94 Ohio App.3d 665, 673–674, 641 N.E.2d 755.

{¶ 71} The state argues that the prosecutor's comments were warranted because they were made in response to the atmosphere created by Condon's counsel. But, upon our review of the record, it was Tobias's counsel who actually made the comments that were alleged to have caused an antagonistic atmosphere. And regardless of any rancor between counsel, we consider the prosecutor's use of the phrase "bullshit project as art" grossly unprofessional and clearly meant to inflame the jury. Further, the prosecutor's comments suggested to the jury that defense counsel was seeking to deceive the jury by deliberately fabricating a false artistic purpose behind Condon's behavior. In our view, the prosecutor's comments were highly inappropriate and constituted prosecutorial misconduct.

{¶ 72} The next alleged instance of misconduct occurred a little while later, when the prosecutor stated during closing argument, in rebuttal, that defense counsel had improperly influenced one of their own witnesses. The prosecutor stated, "Now, this is back when Ernie Waits had this fresh in his mind, before he had a little meeting with all of the defense attorneys on the defense team, before he had a chance to have his memory altered in some fashion * * *." No objection was raised to this comment. Again we hold the suggestion that Condon's defense was fabricating evidence entirely inappropriate.

{¶ 73} Condon further alleges that the prosecution made numerous improper remarks to the jury suggesting that both Condon and Tobias (who, it must be remembered, were tried together) derived some sort of fetishistic sexual pleasure from the bodies photographed. For example, commenting upon Tobias, the prosecution stated, "Now, we start getting into it. You start seeing the sexual overtones that start to pop up in these that are almost identical to what his buddy, the photographer Thomas Condon, takes." Other remarks by the prosecution included the following: (1) Condon molested Folchi's body, (2) Condon had "his way with Christina Folchi and Toby Malakoff," (3) the jury was to pay attention to the progression of "what happens to clothes" when viewing the photographs, and (4) the photographs depicted a "striptease." Another such remark occurred during rebuttal in closing argument where the prosecutor, in talking about crime-scene photographs taken by Tobias, stated, "Here's another photograph. Shirt is still down. * * * Now, that is not enough so now we are going to roll the body over and we are going *to place emphasis on the breast.*" (Emphasis supplied.)

{¶ 74} During closing arguments, the prosecutor must avoid going beyond the evidence presented to the jury. See *State v. Smith,* 14 Ohio St.3d 13,

14, 14 OBR 317, 470 N.E.2d 883. But what was reflected in the photographs and the opportunity to take the photographs were very much at issue in this case. The state's basic argument was that the pictures taken by Condon were taken without permission from the coroner's office and that they were not taken for official business but, rather, for reasons personal to Condon. The argument that the photographs bore some sexual interest could have arguably gone to the jury's consideration of whether the pictures were to be used for "official business" or personal reasons, as well as to Condon's culpable mental state. For these reasons, such comments were not improper under the facts of this case.

{¶ 75} The next instances of misconduct alleged by Condon relate to whether the state improperly appealed to the jury's emotions. During closing argument, the prosecutor referred to the pictures of Frith as "revolting and repulsive," the pictures of Folchi as "disgusting," and the picture of Melton as "horrific." The prosecutor also stated that the way the bodies were "manipulated, propped, pulled, posed, the way they whirled around the live-action camera, it's disgusting, it's revolting and it's repulsive." No objections were raised to these comments.

{¶ 76} The last instance of prosecutorial misconduct cited by Condon concerns the prosecutor's two warnings to the jury to "be careful" when handling the photographs that had been placed in evidence because they might contain "blood or other bodily fluids." Defense counsel again raised no objections to these comments.

{¶ 77} Considering all these remarks in the context of the trial, we view them as disturbing, and, in some instances, as improper, but we are not convinced that they were of sufficient magnitude to have prejudicially affected Condon's constitutional right to a fair trial. This was a lengthy case charged with emotion. Without condoning the prosecutors's episodes of misconduct, we believe that the trial court's instructions to the jury when an objection was made cured any impropriety with respect to those remarks. Moreover, after careful consideration of the record in its entirety, we cannot say that the prosecution's remarks that were not objected to by Condon amounted to plain error. "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." See Crim.R. 52(B). In order to prevail under a plain-error analysis, the defendant bears the burden of demonstrating that the outcome of the trial clearly would have been different but for the error. See *State v. Mundy* (1994), 99 Ohio App.3d 275, 300, 650 N.E.2d 502, citing *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. None of the cited comments, even if arguably inappropriate, were so prejudicial or outcome-determinative as to constitute plain error and to deny Condon a fair trial.

{¶ 78} In sum, we are convinced that, for the most part, the prosecutors focused on the evidence presented during the state's case and what the prosecutors perceived as the weaknesses in Condon's case. So even though some of the comments were inappropriate and inexcusable, we do not conclude that their impact was sufficient to warrant a new trial.

{¶ 79} As for the remaining portion of this assignment, Condon's argument that he was denied a fair trial when the prosecutor failed to disclose the opinion letter from the prosecutor's office, we have already held that the trial court did not err in excluding that letter. Certainly, then, Condon was not entitled to a new trial on that basis. Thus, for the foregoing reasons, we overrule the first assignment of error.

C. *Evidentiary Issues*

{¶ 80} Next, we address Condon's sixth assignment in which he claims that the trial court erred in admitting irrelevant and prejudicial evidence. The admission or exclusion of relevant evidence rests within the "sound discretion of the trial court." *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus. We, therefore, proceed largely under an abuse-of-discretion standard. "The term 'abuse of discretion' connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable * * *." *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144. An error in the admission or exclusion of evidence is properly considered harmless error if it does not affect a substantial right of the accused. See Crim.R. 52(A).

{¶ 81} Condon first argues that the testimony of the family members of the deceased victims was prejudicial because their testimony was irrelevant and had little probative value so as to be substantially outweighed by its undue prejudice. In response, the state maintains that the testimony was admissible to (1) identify the individuals in the photographs, (2) establish lack of consent for taking the photographs, and (3) demonstrate community outrage.

{¶ 82} Evid.R. 401 permits the admission of relevant evidence. But the introduction of relevant evidence is limited by Evid.R. 403(A), which prohibits the introduction of evidence where "its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A).

{¶ 83} Having reviewed the record, we are convinced that the testimony of the family members had probative value, as it helped the jury to determine the identity of the corpses, the lack of consent, and community outrage. The danger of prejudice was minimal because the testimony was limited in scope. And the effect was not enough to mislead the jury or to confuse the issues. In our view,

the probative value of the relatives' testimony was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. As a result, we hold that the trial court did not err in admitting the evidence.

{¶ 84} Second, Condon argues that photographs of several corpses "not related to a specific count" in the indictment were inadmissible as evidence of prior bad acts. Generally, evidence of a defendant's propensity to engage in misconduct and evidence of a defendant's prior misconduct to prove that he later acted in conformity with that conduct is inadmissible. See Evid.R. 404(A) and (B). But evidence of prior misconduct may be admissible where it is probative of things such as "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B). This principle is further embodied in R.C. 2945.59, which provides, "In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant."

{¶ 85} The threshold question in determining the admissibility of other-acts evidence under Evid.R. 404(B) is whether any of the matters of proof are at issue in the case. See *State v. Griffin* (2001), 142 Ohio App.3d 65, 72, 753 N.E.2d 967. Here, the photographs of Gibson, Thomas, Huckaby, and an unidentified corpse were entered into evidence. Daly testified that those photographs were the property of the Hamilton County Coroner's office and that the photographs had been found in Condon's studio. According to the state, the photographs were offered to show Tobias's connection with Condon and were relevant to the issue of aiding and abetting.

{¶ 86} In our view, the photographs were relevant to identify the alleged connection between Condon and Tobias for the purpose of establishing whether those two were involved in a common scheme involving unauthorized use of the coroner's facilities to procure photographs of corpses for personal purposes. Even assuming for the sake of argument that the photographs should not have been admitted, we hold that the error was harmless and did not affect a substantial right because of the overwhelming photographic evidence specifically pertaining to each of the eight counts.

{¶ 87} Finally, Condon argues that the state erred in introducing photographs relating to "pictures of sheet music and other papers" unrelated to the indictment or to a photograph of a human corpse. The contested photographs are not discussed in great detail in the assignment of error; rather Condon merely

identifies them by their exhibit numbers in a footnote. According to the record, the exhibits identified in the footnote actually related to the admission of the following: (1) Eugene White's record kept by the coroner's office, (2) Derrick Thomas's photograph, (3) a diagram of Condon's studio, and (4) Barbara Stevens's videotape deposition. Given the volume of exhibits admitted in this case and the numerous photographs contained in the record (not all of which depicted human corpses), we are unable to discern which exhibits Condon objects to in this assignment. Accordingly, we are unable to review this portion of his assignment of error. The sixth assignment of error is, therefore, overruled.

## MOTIONS FOR ACQUITTAL AND/OR A NEW TRIAL

{¶ 88} In his tenth assignment of error, Condon maintains that the trial court erred in refusing to grant his Crim.R. 29 motion or his motion for a new trial. The grounds for Condon's motion for a new trial were the same as those we have previously discussed in his first, third and sixth assignments of error: (1) prosecutorial misconduct, (2) violation of his First Amendment protections, and (3) admission of irrelevant evidence.

{¶ 89} A motion for a new trial is directed to the sound discretion of the trial court, and the court's decision shall not be reversed on appeal absent an abuse of discretion. See *State v. Schiebel* (1990), 55 Ohio St.3d 71, 564 N.E.2d 54, paragraph one of the syllabus. In light of our disposition of Condon's first, third and sixth assignments of errors, we conclude that the trial court did not err by refusing to grant a new trial on any of the grounds presented. Condon also argues that either his Crim.R. 33(A) motion for a new trial or his Crim.R. 29 motion for acquittal should have been granted because insufficient evidence was presented at trial. The relevant inquiry in this respect is the same as the inquiry for sufficiency. See Crim.R. 33(A)(4); *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 9 O.O.3d 401, 381 N.E.2d 184, syllabus; *State v. Stephens* (June 14, 2002), 11th Dist. No. 2001–T–0044, 2002 WL 1306002. Having already found sufficient evidence supporting Condon's conviction on all eight counts of gross abuse of a corpse in response to the ninth assignment, we similarly conclude that the trial court did not err in denying Condon's motions for a new trial or acquittal on that basis.

## JURY INSTRUCTIONS

{¶ 90} In the eighth assignment, Condon maintains that the trial court erred in instructing the jury regarding the definitions of (1) "aid and abet," (2) "authorized by law," (3) "treat," and (4) "public office/public official." Because Condon was not charged with aiding and abetting, we do not consider the court's instructions on that matter. It is well established that jury instructions must be

reviewed as a whole. See *State v. Burchfield* (1993), 66 Ohio St.3d 261, 262–263, 611 N.E.2d 819. A trial court must give jury instructions that provide a correct, clear and complete statement of the law. See *Bryant v. Walt Sweeney Automotive, Inc.,* 1st Dist. Nos. C–010395 and C–010404, 2002-Ohio-2577, 2002 WL 1071943, ¶ 15. Patterned instructions may aid the trial court in the preparation of the charge to the jury, but jury instructions should be tailored to the facts of the case. See *State v. Shue* (1994), 97 Ohio App.3d 459, 470–471, 646 N.E.2d 1156; *Avon Lake v. Anderson* (1983), 10 Ohio App.3d 297, 299, 10 OBR 472, 462 N.E.2d 188. The trial court retains discretion on how to conform the jury instructions to the evidence presented at trial. See *State v. Guster* (1981), 66 Ohio St.2d 266, 20 O.O.3d 249, 421 N.E.2d 157.

{¶ 91} Condon suggests that the trial court should have better tailored its definition of gross abuse of corpse under R.C. 2927.01 to the facts of this case. First, Condon alleges that the trial court should have elaborated on the portion of the statute relating to "authorized by the law." The trial court's instruction was as follows: "Persons authorized by law include a county coroner and designated members of his staff, physicians and surgeons, accredited medical students, embalmers certified to remove human organs by consent of the deceased according to law, and all other persons acting under authority of law."

{¶ 92} Second, Condon alleges that the trial court should have elaborated on the definition of "treat" under R.C. 2927.01. Condon premises his argument on the fact that taking a picture of a corpse, without evidence of physical alteration, does not constitute an abuse of a corpse.

{¶ 93} The court's language relating to "authorized by law" was practically verbatim from the Ohio Jury Instructions. See 4 Ohio Jury Instruction (2002), 798, Section 527.01(2). While the trial court could have defined "other persons acting under authority of law" more definitively, on the whole, the trial court properly instructed the jury. With regard to "treat," we have already held that the taking of a picture of a corpse for personal use without authorization by law can, given the circumstances, constitute mistreatment of a corpse in violation of R.C. 2927.01(B). Thus, physical alteration is not an element of the crime. The trial court's instruction relating to "gross abuse of a corpse" fairly and correctly stated the applicable law.

{¶ 94} Finally, Condon alleges that, because, in his view, "authorized by law" was not properly defined, the trial court should have instructed the jury about the identity, responsibility, and culpability of public officials who hold public offices. Having already found that the definition given to the jury by the trial court was proper in light of the facts and circumstances of this case, we do not agree that the proposed definitions were relevant or necessary for the jury to weigh the evidence and to reach a decision relating to Condon's culpability,

particularly since Condon was not a public official. Accordingly, we overrule the eighth assignment of error.

## SENTENCING ISSUES

{¶ 95} We now turn to the alleged improprieties that occurred during sentencing. In the eleventh assignment of error, Condon maintains that the trial court erred by sentencing him to a prison term for the commission of fifth-degree felonies. He argues that the trial court disregarded the implicit statutory presumption against imprisonment for the commission of felonies of such low level, and that it failed to make the necessary findings, or supportable findings, to overcome that presumption. Furthermore, he argues that even if it is assumed that a term of imprisonment could be justified under the applicable sentencing guidelines, the trial court erred by imposing the maximum prison terms because the record does not support the trial court's findings that his treatment of the corpses constituted the worst forms of the offense of gross abuse of a corpse. Condon also maintains that the trial court erred in sentencing him to consecutive sentences, and that the trial court considered improper sentencing criteria.

{¶ 96} Initially, we note that Condon may appeal his sentence as a matter of right. This court has held that R.C. 2953.08(A)(1) through (5) provide independent grounds for appeal. See *State v. Beasley* (1999), 134 Ohio App.3d 694, 731 N.E.2d 1223. Pursuant to R.C. 2953.08(A)(1), (A)(2), and (A)(4), "[a]n offender may challenge on appeal the imposition of a maximum prison term, the imposition of a prison term for a fourth- or fifth-degree felony without a finding of one of the R.C. 2929.13(B)(1) imprisonment factors, or the imposition of any sentence that is 'contrary to law.' " *State v. Smith* (Sept. 17, 1999), 1st Dist. No. C–980887, 1999 WL 728533.

{¶ 97} If an appellate court clearly and convincingly finds that the sentence is contrary to law because the record does not support the trial court's findings of the statutory factors in R.C. 2929.13(B), it has the option to modify the sentence or to vacate the sentence and remand the case to the trial court for resentencing. R.C. 2953.08(G)(2). See *State v. Brewer* (Nov. 24, 2000), Hamilton App. No. C–000148, 2000 WL 1732335; *State v. Shryock* (Aug. 1, 1997), Hamilton App. No. C–961111, 1997 WL 1008672. If the trial court simply fails to make the findings required by R.C. 2929.13(B), the appellate court must remand the case with instructions to make the required findings. R.C. 2953.08(G)(1).

### *A. The Sentence Imposed*

{¶ 98} The jury found Condon guilty of eight counts of gross abuse of a corpse under R.C. 2927.01(B), a fifth-degree felony. The trial court gave Condon the maximum sentence on counts two, five, seven, nine, ten, eleven, and twelve, and

the minimum sentence of six months on count six. The court ordered that the sentences on counts two, five, and six be served consecutively and that all the other sentences be served concurrently. All told, Condon was sentenced to a prison term of thirty months or two and one-half years.

{¶ 99} The trial court filled out a felony sentencing worksheet. The worksheet indicated that the court had considered the seriousness and recidivism factors under R.C. 2929.12, the imprisonment factors under R.C. 2929.13(B), minimum and maximum prison-term factors under R.C. 2929.14(B) and (C), and the consecutive-sentencing factors under R.C. 2929.14(E).

*B. Appropriateness of Prison Term*

{¶ 100} Because it is considered a low-level felony, ordinarily a community-control sanction satisfies the overriding purposes of R.C. 2929.11 for a fifth-degree felony. See A Plan for Felony Sentencing in Ohio: A Formal Report of the Ohio Criminal Sentencing Commission (July 1, 1993), 81–82. But a prison term of six to twelve months may be imposed for a fifth-degree felony. See R.C. 2929.14(A)(5). Before imposing a prison term, however, the trial court must consider the seriousness and recidivism factors listed in R.C. 2929.12, and must also consider the imprisonment factors in R.C. 2929.13(B)(1)(a) through (i). A prison term is, in fact, favored for a fifth-degree felony if the trial court finds (1) at least one of the nine enumerated factors in R.C. 2929.13(B)(1)(a) through (i), (2) that the prison term is consistent with the purposes and principles of sentencing in R.C. 2929.11, and (3) that the offender is not amenable to community control. See R.C. 2929.13(B)(2)(a).

{¶ 101} Furthermore, even when the trial court does not find one of the R.C. 2929.13(B)(1)(a) through (i) factors, it may still, in its discretion, impose a prison sentence when " 'it finds that, consistent with the purposes and principles of sentencing, an offender is not amenable to community control.' " See *State v. Brown*, 146 Ohio App.3d 654, 2001-Ohio-4266, 767 N.E.2d 1192, quoting *State v. Brewer* (Nov. 24, 2000), 1st Dist. No. C–000148, 2000 WL 1732335.

{¶ 102} Here, the sentencing worksheet demonstrates that, as to all of the counts, the trial court found that one of the factors in R.C. 2929.13(B)(1) existed, namely that Condon held a public office or position of trust and that the offense related to the office, or that Condon's professional reputation or position facilitated the offense or was likely to influence the future conduct of others. The court also determined that prison was consistent with the factors set forth in R.C. 2929.12, as well as the purposes and principles of sentencing set forth in R.C. 2929.11. The trial court concluded that Condon, although a first offender, was not amenable to community control.

1. *R.C. 2929.13(B)(1)—Condon as a Public Official*

{¶ 103} Pursuant to R.C. 2953.08(G)(2)(a) and (b), an appellate court may not disturb a sentence imposed under Senate Bill 2 unless it finds by clear and convincing evidence that the sentence is not supported by the record or is contrary to law. Clear and convincing evidence is that "which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *State v. Eppinger* (2001), 91 Ohio St.3d 158, 164, 743 N.E.2d 881, quoting *Cross v. Ledford* (1954), 161 Ohio St. 469, 477, 53 O.O. 361, 120 N.E.2d 118. Because the trial court has the best opportunity to examine the demeanor of the defendant and to evaluate the impact of the crime on the victim and society, it is in the best position to make any factual determinations required by the sentencing statutes. See *State v. Martin* (1999), 136 Ohio App.3d 355, 361, 736 N.E.2d 907.

{¶ 104} The question of whether Condon was a public official, or held a position of public trust, or used his professional reputation to facilitate his crimes, is largely a question of law. This court has previously discussed at length this sentencing factor in *State v. Flahive,* (1998), 127 Ohio App.3d 32, 711 N.E.2d 746, and *State v. Brewer,* supra. In *Flahive,* a majority of this court held that a cashier or clerk at a business who misused the credit cards of customers could be found to satisfy the third sentencing factor found in R.C. 2929.13(B)(1)(d), requiring that the "offender's professional reputation or position facilitated the offense." The more recent position of this court, however, was stated in *Brewer,* in which we made clear that the sentencing factor found in R.C. 2929.13(B)(1)(d) was not meant to apply to every breach of an ethical, moral, filial, or professional duty by a private individual. Rather, we held in *Brewer* that R.C. 2919.13(B)(1) was primarily intended to target public officials and public servants who abuse their positions of public trust. Although we eschewed an absolute rule that a private individual can never occupy a position of trust worthy of imposing a prison sentence, we adhered to the view that a position of trust is one that derives generally from the offender's public, as opposed to private, standing. As noted by Judge Painter in his concurrence, our holding in *Brewer* validated the dissent in *Flahive,* which made the point that the professions to which R.C. 2929.13(B) refers are those traditionally thought to invoke a special relationship of trust—such as doctor, lawyer or accountant. *Brewer,* supra (Painter, J., concurring); see, also, *Flahive,* supra, at 35–37, 711 N.E.2d 746 (Gorman, J., dissenting).

{¶ 105} Here, the evidence was clear that Condon was not a public official. Nor did he hold a position of public trust. Although Condon was a professional photographer, his professional standing did not invoke a special relationship of trust, nor did his professional reputation, as such, facilitate the crime. Indeed,

the state's theory at trial was that Condon was acting as an outsider without permission and under false pretenses when he photographed the corpses. Therefore, we hold that the trial court's finding on the applicability of the sentencing factor contained in R.C. 2929.13(B)(1)(d) was clearly and convincingly wrong.

*2. Appropriateness of Prison Term as Opposed to Community Control*

{¶ 106} Although the trial court erred by finding that one of the factors in R.C. 2929.13(B)(1) applied, it was still possible for the trial court to have imposed a prison term if it believed that Condon was not amenable to community control, or that a non-prison sentence would demean the seriousness of his crimes and be inconsistent with the purposes and principles of sentencing. See *Brewer,* supra. As noted by Judge Griffin and Professor Katz, such an analysis generally requires that the trial court "have evidence that some of the available local sanctions have been tried and failed." Griffin and Katz, supra, Section 6.16, 462. However, even if local sanctions are available, the seriousness of the crime, even for a fifth-degree felony, may require a prison term. It is noteworthy in this regard that Condon's offenses do not conveniently fit into the normal template of a fifth-degree felony, which is generally nonviolent and does not involve moral turpitude. Gross abuse of a corpse is unusual for a fifth-degree felony as it involves both conduct with a potential for inflicting severe emotional harm and behavior that is so aberrant that it causes a sense of societal outrage.

{¶ 107} As noted, the trial court found that a prison sentence was consistent with the factors set forth in R.C. 2929.12 and the sentencing purposes outlined in R.C. 2929.11. The two overriding purposes of felony sentencing are to protect the public from future crime by the offender and to punish the offender. R.C. 2929.11(A). The trial court made clear throughout the sentencing hearing that it considered Condon unremorseful for his conduct, taking the artistic highroad that what he did was fully justified. A lack of genuine remorse is an indicator of future crime under the statutory factors and guidelines for likely recidivism in R.C. 2929.12(D). Further, the trial court also made clear by its statements that it considered a sentence that did not include a prison term to demean the seriousness of the offenses, which it found truly repugnant and emotionally devastating to the families involved.

{¶ 108} Concededly, another court might have found that Condon should have been given an opportunity to participate in some type of local community-control sanction. This trial court did not. The court was in the best position to observe Condon's demeanor and to judge his character so that it could determine whether he was understanding of the nature of his crimes and would be rehabilitated through community control. The court was also in the best position to judge the seriousness of his crimes, involving multiple bodies and committed on more than

one occasion, and whether community control would serve to demean them. Accordingly, we cannot say clearly and convincingly that the trial court erred by determining that a prison sentence was appropriate for Condon.

*C. Maximum Prison Term*

{¶ 109} To impose more than the shortest term required for a first offender such as Condon, the trial court must make one of the findings listed in R.C. 2929.14(B). When it imposed the longest prison terms from the range of punishments, the trial court was required to find, pursuant to R.C. 2929.14(C), that Condon had committed the "worst forms of the offense," or that he posed the greatest likelihood of recidivism. In addition to making one of the findings, the trial court also had to state the reasons supporting those findings. See R.C. 2929.14(C) and 2929.19(B)(2)(d); *State v. Edmonson,* 86 Ohio St.3d 324, 328–329, 1999-Ohio-110, 715 N.E.2d 131.

{¶ 110} The trial court found not only that imposition of the shortest prison term demeaned the seriousness of Condon's crimes, but that Condon had committed the worst forms of the offense and deserved therefore the maximum sentence on seven of the eight counts. In making this determination, the trial court clearly found Condon's actions "disgusting, disrespectful, and the worst form of invasion of privacy." Further, the trial court appropriately relied upon the fact that Condon's acts had "caused great devastation and anguish to the families of the people whose bodies were exploited."

{¶ 111} Condon contends that the trial court erroneously relied on the statements and written testimony of the surviving family members to form its opinion on the severity of his offenses, and that the court erred in "generically" determining that Condon's actions constituted the worst forms of gross abuse of a corpse and that they would be demeaned by imposing the shortest term of imprisonment. He argues that taking pictures of corpses cannot be the worst form of the offense when case law demonstrates that others have mutilated or otherwise physically abused corpses in far more desecratory fashion.

{¶ 112} The state, on the other hand, argues that the trial court was correct to measure the severity of Condon's behavior based upon its effect on the deceased's family and friends. According to the state, the trial court could reasonably have found that, as terrible as the family would feel to have their loved one's body physically abused, it would be far worse to have the naked corpse used and displayed, without their permission, in some sort of "art" show or on the Internet. Although there was no evidence that Condon was preparing to display the photographs, the state argues that was a reasonable, if not inescapable, inference, because there was no other reason for a professional photographer such as Condon to take the photographs other than to put them eventually on some sort

of display. They were not so displayed, the state argues, only because the police intervened before Condon could publish or display them in some format.

{¶ 113} We find this argument persuasive but not compelling to the degree necessary to establish these offenses as the worst forms of abusing a corpse. While Condon may have demonstrated a culpable degree of recklessness, a shameful insensitivity, and callow indifference to the mores of his community and the feelings of others, it cannot be seriously argued that what he actually did to the corpses showed the same degree of depravity as others who have dismembered, sexually abused, or perpetrated other despicable acts upon a corpse. Unlike other crimes, a violation of R.C. 2927.01 starts at the point of outrage—outrage is an essential element of the offense. This being so, there is a natural tendency to overpunish any offender, no matter what he did, focusing only on the outrage and pain and not on the manner in which it was inflicted. But the sentencing statutes require that the sentencing authority look beyond the emotions aroused by the behavior and focus on the behavior itself.

{¶ 114} Abuse of a corpse, as noted, may involve all sorts of reprehensible behavior for motives that are truly sinister, pathological, or debase. Recent events in Georgia concerning a cemetery owner who abused hundreds of corpses, burying them in shallow, makeshift graves for the purpose of avarice and greed, certainly demonstrate forms of the offense much more severe than Condon's. Further, the state is attempting to have it both ways by arguing that Condon should be punished for the worst forms of the offense because, had the police not intervened, he would have published the photographs and thus, at that point, committed the worst forms of the offense. This argument is self-defeating as it tacitly acknowledges that Condon's behavior, at the point of police intervention, had not reached the worst-forms level.

*D. Use of Unpermitted Sentencing Criteria*

{¶ 115} Condon also contends that the trial court committed error when, over his objection, it considered various victim-impact statements before imposing the sentence. He maintains that R.C. 2947.051 authorizes use of a victim-impact statement only in those cases in which the offender "caused, attempted to cause, threatened to cause, or created a risk of physical harm to the victim."

{¶ 116} This argument incorrectly assumes that R.C. 2947.051 restricts the trial court's discretion to obtain relevant information about the impact of a crime upon the victim's family and friends in cases in which the offender has not threatened, attempted to cause, or caused physical harm. To the contrary, R.C. 2947.051 only mandates that the trial court order a victim-impact statement for certain types of crimes but does not prohibit the trial court from doing so for others.

{¶ 117} The prosecution, furthermore, had a right to respond to Condon's mitigation testimony by offering testimony "to give the court a true understanding of the case." R.C. 2947.06(A)(1). And according to R.C. 2929.19(A), either the victim (as defined in R.C. 2930.01[H] ) or the victim's representative (as defined in R.C. 2930.01[I] ), or *any* other person with approval of the trial court, may speak at the sentencing hearing. The trial court has discretion to determine the number of persons with relevant information who can speak at the hearing. See *State v. Harwell,* 149 Ohio App.3d 147, 150, 2002-Ohio-4349, 776 N.E.2d 524. Finally, it should be noted that, regardless of the nature of the harm resulting from the crime, any statement by the victim regarding the impact of the crime must be used in the preparation of the presentence-investigation report and, if in writing, included in the report. R.C. 2930.13(B).

{¶ 118} As long as those persons who address the court do not express an opinion as to the sentence that should be imposed, the trial court may consider relevant statements regarding the impact of the offense on a victim's family and friends. *State v. Fautenberry,* 72 Ohio St.3d 435, 439, 1995-Ohio-209, 650 N.E.2d 878. While it is true that some of the family members in this case expressed their preference for the maximum sentence, unless it affirmatively appears to the contrary, the trial court is presumed to have considered only relevant, material and competent evidence in selecting the sentence imposed. See id. Furthermore, we have already held that it was error for the trial court to have imposed maximum sentences, and to that extent, we have already remedied any prejudice that may have resulted from the family members' testimony advocating maximum sentences. For all these reasons, we hold that Condon has failed to demonstrate reversible error on the basis that the trial court violated the sentencing statutes or abused its discretion in considering the victim-impact evidence.

## CONSECUTIVE SENTENCES

{¶ 119} We next evaluate whether the trial court erred in imposing consecutive sentences. The imposition of consecutive sentences is reviewable as contrary to law pursuant to R.C. 2953.08(A)(4).

{¶ 120} Prior to ordering that sentences be served consecutively, the trial court must find that consecutive sentences are necessary to protect the public from future crime or to punish the offender, and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger that he poses to the public. See R.C. 2929.14(E)(4). Further, the court has to find that one of the factors listed in R.C. 2929.14(E)(4)(a) through (c) is applicable. Finally, the court has to provide its reasons for each finding.

{¶ 121} Condon contends that the trial court failed to make the appropriate findings on the record and failed to give its reasons for consecutive sentences. We disagree. While the trial court did not articulate findings or give its reasons for consecutive sentences at the sentencing hearing, it did identify its findings and reasons on the sentencing worksheet. The trial court found that consecutive terms were "[n]ecessary to protect public and/or punish the offender and not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public." The court also found that, pursuant to R.C. 2929.14(E)(4)(b), the harm caused by two or more of the multiple offenses was "so great or unusual that a single prison term is inadequate." Finally, the court provided the following reasons to support its findings: "Evidence showed that illegal acts of defendant are disgusting, disrespectful, and the worst form of invasion of privacy. These illegal acts of defendant have caused great devastation and anguish to the families of the people whose bodies were exploited."

{¶ 122} We hold that the trial court adequately made findings and explained its reasons with ample justification on its journalized sentencing worksheet. Further, we cannot clearly and convincingly say that the record does not support the imposition of consecutive sentences in the instant case. Nor can we clearly and convincingly say that the trial court erred in assessing the degree of emotional harm inflicted upon the families by Condon's use of the bodies of their loved ones as objects to be photographed for his art project.

CUMULATIVE ERROR

{¶ 123} Condon's final assignment is that the cumulative and incremental effect of the errors committed at his trial deprived him of a fundamentally fair trial and requires a reversal of his conviction. Because we have overruled Condon's assignments relating to errors allegedly committed at trial, there is no cumulative error to recognize in this case. See, generally, *State v. Davis* (1991), 62 Ohio St.3d 326, 581 N.E.2d 1362, 1380.

THE SENTENCE IMPOSED BY THIS COURT

{¶ 124} Based upon the foregoing analysis, we affirm the findings of guilt on all eight counts. We affirm, also, the trial court's imposition of a prison term and its order that the sentences on counts two, five, and six run consecutively. We overturn the trial court's finding, however, that Condon's crimes constituted the worst forms of abusing a corpse under R.C. 2927.01(B). Pursuant to our authority under R.C. 2953.08(G)(2), we impose the minimum prison term of six months on all counts, reducing Condon's term of imprisonment from thirty to eighteen months, and to be further reduced, appropriately, by all credit for which he is entitled for time served under R.C. 2967.19.1 and 2967.19.3. The judgment

of the trial court is, accordingly, affirmed with this modification in Condon's sentence.

Judgment affirmed as modified.

SUNDERMANN, J., concurs separately.

PAINTER P.J., concurs in part and dissents in part.

SUNDERMANN, Judge, concurring separately.

{¶ 125} I concur in the well-reasoned opinion of the court. I agree that Condon's guilt has been proven and that consecutive sentences are appropriate in this case. I write separately to say that I think that the trial court could properly have found that these were the worst forms of the offense of abuse of a corpse. It has been argued that taking pictures of corpses cannot be the worst form of the offense and that the worst form occurs only where bodies have been mutilated or subjected to some other physical abuse, but not when they have been photographed. That is indeed a terrible thing, but the bodies so abused are beyond pain or humiliation. We must look to how the acts of Condon affected the deceased's family and friends. I believe that the trial court could reasonably have found that, as terrible as it would be to have a loved one's body abused, it could be far worse to have the naked corpse displayed without permission in some sort of "art" show or on the Internet. Clearly the purpose of these pictures was for their use in Condon's project to capture the "life cycles" of humans. There could be no reason for a professional photographer to take them other than to put them on display. They were not so displayed only because the police intervened before this could happen. I cannot say that the trial court erred in taking this view and in thereupon imposing the maximum sentence for certain counts.

PAINTER, Presiding Judge, concurring in part and dissenting in part.

{¶ 126} Being a judge is never having to say you've seen everything. This case is evidence of the endless variety of human foibles.

{¶ 127} Perhaps some might consider the photographs art. Though I am not among that number, I recognize the right of free expression. Condon could not be punished for art—but he can be punished for treating corpses in the manner he did here. Thus, I concur with that part of Judge Gorman's learned opinion.

{¶ 128} The trial court should have released the prosecutor's opinion letter—why keep it secret? But I agree that the result would not have changed.

{¶ 129} As to sentencing, I concur with the majority in all but one particular. The consecutive sentences cannot be justified on this record.

{¶ 130} Condon surely is not a threat to do this *again*. A prison sentence of *any* length would be sufficient to impress upon him the wrong-headedness of his behavior and to validate community outrage.

{¶ 131} Though I agree with the majority that this record can support a six-month sentence, there should be no consecutive sentences. A case that does not justify even the maximum sentence for any one count logically cannot support a *consecutive* sentence. The sentence should have been six months. More than that has already been served. Thus, I dissent as to the consecutive sentences only.