[Cite as *State v. Parker*, 2024-Ohio-2212.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## TRUMBULL COUNTY

| | |
|---|---|
| STATE OF OHIO, | **CASE NO. 2023-T-0012** |
| Plaintiff-Appellee, | |
| - vs - | Criminal Appeal from the<br>Court of Common Pleas |
| ANTUAN M. PARKER, | |
| Defendant-Appellant. | Trial Court No. 2021 CR 01000 |

**O P I N I O N**

Decided: June 10, 2024
Judgment: Affirmed

*Dennis Watkins*, Trumbull County Prosecutor, and *Ryan J. Sanders*, Assistant Prosecutor, Administration Building, Fourth Floor, 160 High Street, N.W., Warren, OH 44481 (For Plaintiff-Appellee).

*Allison F. Hibbard*, 4403 St. Clair Avenue, Cleveland, OH 44103 (For Defendant-Appellant).

JOHN J. EKLUND, J.

{¶1} In the early morning hours of September 27, 2021 in Warren, Ohio, Desarae Boss died tragically and violently; she was shot in the head at Appellant's house. No fewer than four other people were present. For some hours before the shot was fired, illicit drugs were being bought, sold, and consumed in the house. Appellant was charged in connection with the death. On June 1, 2022, the Trumbull County Grand Jury indicted Appellant on eight counts. Appellant pled not guilty to all counts. A five-day jury trial was held.

{¶2} On January 13, 2023, a jury found Appellant guilty on the following counts: (1) Murder, a first-degree felony in violation of R.C. 2903.02(A), with a firearm specification in violation of R.C. 2941.145; (2) Gross Abuse of a Corpse, a fifth-degree felony in violation of R.C. 2927.01(B); (3) and (8) Tampering with Evidence, third-degree felonies in violation of R.C. 2921.12(A)(1); (4) and (5) Having Weapons While Under Disability, third-degree felonies in violation of R.C. 2923.13(A)(3); (6) Aggravated Arson, a first-degree felony in violation of R.C. 2909.02(A)(1); and (7) Aggravated Arson, a second-degree felony in violation of R.C. 2909.02(A)(2).[1] He now appeals.

{¶3} Appellant raises five assignments of error: (1) the court erred in permitting the State to play a 911 call that contained statements of non-testifying witnesses; (2) trial counsel rendered ineffective assistance of counsel because he did not file a motion to suppress defendant's statement during his police interview that he had taken a suboxone strip; (3) the trial court erred in permitting the prosecution to elicit prejudicial testimony by leading a witness; (4) there was insufficient evidence to convict Appellant of Gross Abuse of a Corpse; and (5) Appellant's conviction of Murder was against the manifest weight of the evidence.

{¶4} After a review of the record and applicable caselaw, we find Appellant's assignments of error are without merit. First, the court did not err in permitting the State to play the 911 call because it was admissible and neither violated the Confrontation Clause nor contained impermissible hearsay statements. Second, trial counsel was not

---

1. All counts in the indictment were the same counts as described in paragraph 2, with the exception of count one. Count one under the indictment was Aggravated Murder in violation of R.C. 2903.01(A). On count one, the jury found Appellant guilty of the lesser included offense of Murder, in violation of R.C. 2903.02(A).

2

ineffective for failing to move to suppress because Appellant has not established a reasonable probability the result of the trial would have differed if the motion had been filed. Third, the trial court did not commit plain error in allowing the State to ask a leading question because it did not affect the trial's outcome. Fourth, the State presented sufficient evidence that Appellant treated a human corpse in a way that would outrage reasonable community sensibilities. Lastly, Appellant's conviction of Murder was not against the manifest weight of the evidence because, based on all the evidence before it, the jury did not clearly lose its way and create such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.

### Trial Proceedings

{¶5} On January 9, 2023, a five-day jury trial commenced. The State offered the following witness testimony.

{¶6} Miguel Acevedo testified that he met Appellant in summer or fall, 2021, and had occasionally bought crack cocaine from him. Acevedo testified that he arrived at Appellant's residence on Oak Street in Warren, Ohio on September 27, 2021 to purchase crack cocaine. Acevedo said that there were four other people at Appellant's house when he arrived. Acevedo stated that he later found out one of the people in the house was the victim. Acevedo said that Appellant was in an argument, "screaming" and "yelling" at someone, so one of the other occupants sold Acevedo the drugs. While the transaction occurred, "that's the moment when [Appellant] sent his hand into the room he's arguing with the person and pulled [the victim] from the hair * * * this whole time he's arguing, he's got a gun in his hand." Acevedo described: "All I see was the argument, pulling her from over there to the middle, and then screaming, asking, he went like this with the gun on

3

top of her head, and boom. I heard the shot. That's exactly the moment the white dude is passing me the drug. I turn around and I was, like, I'm outta here. So I got into the car." Acevedo testified that he did not see Appellant shoot the victim, but that he did not see anyone in the house other than Appellant possessing a firearm.

{¶7} Acevedo said that he returned to Appellant's residence on October 1, 2021 to purchase drugs. Acevedo explained "[a]s soon as he gave it to me, he also want to hit it so we stayed there hitting a couple of times. And that's a moment when [the victim's] family, maybe, I'm thinking her brother, walked into the house just like he lived there." Acevedo said the man asked Appellant if he knew where the victim and her vehicle were, but that Appellant replied that he did not. Acevedo testified that Appellant then walked to the basement and returned holding "the same gun" that he possessed on September 27, 2021. The man then left the house and stood on the sidewalk with the victim's family, who were waiting outside.

{¶8} Thomas Holbrook testified that he knew Appellant socially and they sold drugs together. He said that he had met the victim once, on the evening of September 26, 2021, when he was at Appellant's house smoking crack cocaine with Appellant, the victim, and Melissa Mack. Holbrook said that as the night progressed, Appellant started accusing the victim of "stealing his dope." Holbrook explained that Appellant and the victim were arguing when Appellant "threatened to beat her up at first and then when he grabbed -- he grabbed a gun from the top of the counter and threatened to kill her." Holbrook testified that a man then entered the house to buy drugs, so he sold the man drugs because Appellant was still arguing with the victim. As Holbrook was finishing the transaction, he saw Appellant grab the victim by her hair and then he heard a gunshot.

4

Holbrook returned to the kitchen where the victim was shot and saw Appellant "scratching his head with the gun" and heard Appellant say "damn, that was my bitch." Holbrook saw the victim's body on the ground surrounded by blood.

{¶9} Appellant asked Holbrook and Melissa Mack to step outside of the house with him to determine what he should do with the victim's vehicle. Holbrook said he saw "a way to get Melissa out of the house * * * asked her if she would do it." Holbrook saw Mack take the victim's keys and drive the car away. Later that night, Holbrook reunited with Mack at another friend's house, where Appellant later arrived, asking them not to say anything about the shooting.

{¶10} Holbrook returned to Appellant's residence on October 4, 2021 when Appellant asked him and Mack to drive him past his house. Appellant explained to them that "he tried to catch [the house] on fire and he didn't know if it caught fire. So we went to USA Gas Mart to get lighter fluid." Holbrook said that they could see smoke coming from Appellant's house when they left the USA Gas Mart's parking lot. They then drove to the house, saw the fire department and police department there, and decided to stay in the car and watch from an empty field across the street. Appellant did not speak to, nor did he approach, the fire department or police officers to notify them that he resided in the house.

{¶11} Melissa Mack testified that she and Holbrook were at Appellant's house on the evening of September 26, 2021 to buy drugs. She met the victim at Appellant's house that night. Mack explained that at one point during the evening, Appellant noticed some of his "dope" was missing and accused the victim of taking it. The victim denied the accusation, but the arguing continued. Mack heard Appellant tell the victim "he would f***

5

her up, you know, don't make me f*** you up." Mack observed, "[n]ext thing you know, [Appellant] had a gun in his hand." Mack testified that Appellant then threatened the victim: "Bitch, you gonna give me my dope. I'm not playin' with you." Mack said that she was in the kitchen with Appellant and the victim while this was happening and Holbrook was selling drugs to Acevedo nearby in the living room. Mack then saw the victim attempt to leave through the living room. Mack said Appellant grabbed the victim, pulled her back into the kitchen near the sink, and shot her in the head. Mack saw Appellant shoot the victim and her body fall to the ground with blood surrounding her. Mack said she then drove the victim's vehicle to Front Street so that it would be found and threw the keys into an empty field.

{¶12} Mack next testified to the events occurring on October 4, 2021. She said that she and Holbrook met Appellant at the USA Gas Station because he wanted them to drive him to his house. He explained that he wanted to drive by the house because he was not sure if it had caught on fire. Mack said that Appellant confided later that day that "he started the fire on top of the mattress upstairs in the bedroom."

{¶13} Christine Barr testified she knew Appellant as a social friend and that Appellant occasionally sold her crack cocaine. During direct examination, the following testimony took place:

Q. Okay. So you showed [Appellant] an article on your

phone that talked about Desirae Boss's death?

A. Yes.

Q. And what, if anything, did he say about that?

A. He didn't really say anything.

Case No. 2023-T-0012

Q. Did he -- did you ask him about it?

A. No, I didn't know he was affiliated at all.

Q. Do you remember him winking at you?

A. Yeah.

Q. Can you tell me about that, please?

A. He said after he read it, he said, I didn't

have nothing to do with it and he went -- winked at

me.

{¶14} Kayla Mathey testified that Appellant occasionally sold her drugs. She testified that she called Appellant on October 4, 2021 at approximately 1:00 or 2:00 a.m. to purchase drugs. When Appellant arrived where she was, Mathey said Appellant "looked at me and he said that he was going to go to jail for a long time. And I said why. And he said because of the domestic violence with his baby mom. And I just looked at him and was, like, well, you're not going to go to jail for a long time for that." Appellant then drove Mathey to his house to purchase drugs. She testified that while she was in Appellant's vehicle, he asked if she remembered meeting the victim and informed her that the victim had died. Mathey said Appellant told her that "it's all right, she got what she deserved. She stole a couple of bands from me before I went to jail and that night I brought her to your house, she stole it back from me." Mathey described:

> And I'm just looking at him and he told me that there was blood
> in his mom's basement and that he asked me if I would help
> him burn his mom's house down. And I'm just looking at him,
> like, you know, like, dead in his face, like, you know, and he
> told me -- he said, if you think I did that to her, what the f*** do
> you think I'm going to do to you.

7

Mathey said that when they entered a driveway, "he told me that he killed her, that there was blood in the basement" and again asked her to help burn the house down. Mathey then fled from the vehicle.

{¶15} Denise Code, the victim's mother, testified that she knew Appellant through her daughter. She explained her daughter's relationship with Appellant: "I think it was an off and on thing. I don't think they were in a steady relationship but they were friends and, like, friends with benefits. It was also a drug relationship." Code had last seen her daughter during the day on September 26, 2021. Code became concerned about her daughter because she expected her to pick up her daughter, who Code had been babysitting. Code tried to contact her daughter for two days to no avail, explaining that all calls were sent directly to voicemail. Approximately two days after her daughter's disappearance, Code called 911 to report her missing and filed a missing person's report.

{¶16} On October 1, 2021, Code and six others arrived at Appellant's house to ask if he knew what had happened to her daughter. Appellant told Code that he had not seen her since September 27 and did not know where she was. She testified that Appellant was holding a gun while she confronted him about her daughter's disappearance. Exhibit 3, a cell phone video of the events on October 1, also showed Appellant standing on the front porch with a firearm in his hand.

{¶17} Alesia Code, the victim's aunt and Denise Code's sister testified that she accompanied Denise Code to Appellant's house on October 1, 2021 for information on her niece's disappearance. Alesia testified that they were inside Appellant's house, but "scurried off" outside to the sidewalk when he appeared with a gun in his hand. A confrontation continued outside. Alesia called 911 to report Appellant's holding a gun.

8

The State offered the 911 call as exhibit 7 and played the call for the jury. Defense counsel objected to the call being played, citing hearsay. The court overruled the objection. Defense counsel later moved for a mistrial, asserting Confrontation Clause violations. The court denied the motion. After the State rested its case, defense counsel objected to the call being admitted into evidence. The court overruled the objection.

{¶18} Officer Hoffman, a patrolman for the Warren City Police Department, testified that on September 27, 2021, he was dispatched to Front Street to investigate an abandoned vehicle. He looked in the vehicle, but did not see any keys. After he looked in the vehicle, an inventory search was conducted. He said the inventory search revealed the vehicle contained a laptop, a cell phone, and two pairs of shoes. Those objects were later identified as the victim's possessions. After the inventory search, the vehicle was towed.

{¶19} Officers Adkins and Shipman testified that they were dispatched on October 2, 2021 because the victim's body had been found in a "wooded area" near Choctaw Avenue in Warren, Ohio.

{¶20} Dr. George Sterbenz, a forensic pathologist and deputy coroner for Trumbull County testified that he conducted the victim's autopsy. Dr. Sterbenz described the state of the victim's body: "There was some dirt and vegetation debris on her body * * * And there is early -- what I would classify as early to moderately advanced putrefaction which is post-mortem change of the body and there is, indeed, maggot activity. And that would be fly maggots. And we can see these little white specs over her face are, indeed, maggots." He explained the victim's "extent of post-mortem change, this is indicative of days, plural, more than one day." Dr. Sterbenz next pointed to the gunshot wound on the

9

right side of the victim's face. He explained that "[t]he appearance of this gunshot entrance wound is obviously altered by post-mortem change" due to maggots on her face. He described that the maggots had further altered the victim's face since her death because the maggots had "digested" her skin causing "small tiny holes * * * where the maggots have kind of eaten straight in and they leave kind of perforated appearance to the skin." Dr. Sterbenz concluded that the victim's cause of death was a gunshot wound to her head.

{¶21} Assistant State Fire Marshal Todd Stitt testified that he reported to the fire at Appellant's house. He determined that the fire was "deliberately set by a human act." He further found that the fire started at a mattress in the dining room, causing a "total loss" of the home.

{¶22} Following the witness testimony, the State rested its case. The defense moved for acquittal under Crim.R. 29. The court denied the motion. The defense presented no testimony and rested its case. The defense renewed its Crim.R. 29 motion for acquittal. The court denied the motion. The jury deliberated and found Appellant guilty of counts two through eight as set forth in the indictment. The jury found Appellant not guilty of count one, Aggravated Murder, but guilty of the lesser included offense of Murder, in violation of R.C. 2903.02(A).

{¶23} On January 25, 2023, the court held a sentencing hearing. It sentenced Appellant to an aggregate prison term of forty-two years to life in prison.

**Assignments of Error and Analysis**

{¶24} Appellant timely appealed and raises five assignments of error.

{¶25} **First assignment of error: "The trial court abused its discretion in permitting the state of Ohio to play a 911 call that contained statements of non-testifying witnesses."**

{¶26} Appellant asserts two reasons why the trial court abused its discretion by allowing the State to play the recording of Alesia Code's 911 call to the jury. He first contends that playing and admitting the recording violated Appellant's rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution[2] because it contained statements in the background of the call by people who were not testifying witnesses.

{¶27} Appellant also argues that the trial court abused its discretion in allowing the State to play the recording because it contained impermissible hearsay statements.

{¶28} "Although we generally review decisions on the admission of evidence for an abuse of discretion, appellate courts apply a de novo standard of review to evidentiary questions raised under the Confrontation Clause." *State v. Zaccone*, 11th Dist. Trumbull No. 2017-T-0070, 2018-Ohio-5340, ¶ 13, citing *State v. Edwards*, 11th Dist. Lake No. 2012-L-034, 2013-Ohio-1290, ¶ 24.

{¶29} Likewise, this court has held that whether evidence constitutes inadmissible hearsay is a question of law subject to de novo review. *Morford v. Morford*, 2018-Ohio-3439, 118 N.E.3d 937, ¶ 12 (11th Dist.). "Determining whether the evidence is offered for an impermissible purpose does not involve the exercise of discretion * * *, an appellate court should scrutinize the [trial court's] finding under a de novo standard of review." *State*

---

2. Article I, Section 10 of the Ohio Constitution guarantees a criminal defendant the right "to meet the witnesses face to face."

11

*v. Hartman*, 161 Ohio St. 3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 22, citing *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 17.

{¶30} The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." It prohibits "the admission of a testimonial hearsay statement made by a declarant who does not testify at trial unless (1) the declarant is unavailable and (2) the defendant had a prior opportunity to cross-examine the declarant*." State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 173.

{¶31} "The proper inquiry for determining the testimonial nature of a statement is 'whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime.'" *State v. Metter*, 11th Dist. Lake No. 2012-L-029, 2013-Ohio-2039, ¶ 35, quoting *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004).

{¶32} The Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford v. Washington*, 541 U.S. 36, 59, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), fn. 9, citing *Tennessee v. Street*, 471 U.S. 409, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985); *Williams v. Illinois*, 567 U.S. 50 132 S.Ct. 2221, 2227-2228, 183 L.Ed.2d 89 (2012).

{¶33} Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C).

{¶34} Appellant argues that the recording of the 911 call at issue contained "several voices saying various things which are hearsay not pertinent to reporting the

12

incident." Our review of the record demonstrates it did not. The only voices this court clearly discerns are those of Alesia Code and the 911 operator. Alesia Code testified that she made the 911 call. The 911 operator did not make any testimonial statements.

{¶35} Appellant does not direct us to any specific instances of hearsay in the 911 call. Appellant only states that "the call contained statements by people which implicated [Appellant] in some form of wrongdoing * * *." Our review of the 911 call recording reveals there is one potential hearsay statement. We review that statement accordingly.

{¶36} Approximately five minutes into the seven-minute phone call, the 911 operator, who had expressed concern about Alesia Code's safety, asked "what's going on now, ma'am?" Alesia Code replied saying that she was talking to Appellant's neighbors who said they witnessed Appellant move the victim's vehicle at 7:00 a.m. on September 29, 2021.

{¶37} The statement was made by someone other than the witness, Alesia Code. Arguably, it was testimonial because the neighbors could reasonably have anticipated the statement being used against Appellant in the investigation. Importantly, Alesia Code was on the phone with the 911 operator when the statement was made to her.

{¶38} But, Appellant fails to articulate a basis for finding it was offered to prove the truth of the matter asserted. And, it is not at all clear how it could have been. The State already had presented unrefuted evidence to the jury that the police had found and seized the victim's vehicle on September 27, and that Melissa Mack had moved the vehicle to where they found it. To offer the neighbor's statement for its truth would have *disproven* the State's theory of the case and risked creating a hopeless inconsistency in the testimony it had elicited from its witnesses.

13

{¶39} Since the tape recorded call contains no discernable direct testimonial statements by non-testifying witnesses, and the only testimonial statements we discern from it were not hearsay (not offered for its truth), the trial court did not err in allowing it to be played and admitted.

{¶40} We acknowledge that the State argues in its brief that the excited utterance and present sense impression exceptions, as well as harmless error, apply in this case. But, having determined that the recording did not violate the Confrontation Clause and that the neighbors' statement was not hearsay, we decline to address and analyze those arguments.

{¶41} Appellant's first assignment of error is without merit.

{¶42} **Second assignment of error: "Trial counsel was ineffective for failing to file a motion to suppress defendant's statement."**

{¶43} "'In evaluating ineffective assistance of counsel claims, Ohio appellate courts apply the two-part test enunciated by the United States Supreme Court in *Strickland v. Washington* (1984), 466 U.S. 668, [104 S.Ct. 2052, 80 L.Ed.2d 674]." *State v. Woodard*, 11th Dist. Ashtabula No. 2009-A-0047, 2010-Ohio-2949, ¶ 11. "First, it must be determined that counsel's performance fell below an objective standard of reasonableness." *Id.* "Second, it must be shown that prejudice resulted." *Id.* "Prejudice exists when 'the result of the trial would have been different' but for counsel's ineffectiveness.'" *Id.,* quoting *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989) at paragraph 3 of the syllabus.

{¶44} In applying the foregoing standard, a reviewing court indulges a strong presumption that counsel's conduct is within the wide range of reasonable professional

14

representation. *Strickland* at 689. An attorney's arguably reasoned strategic or tactical decisions do not generally constitute ineffectiveness. *State v. Phillips*, 74 Ohio St.3d 72, 85, 656 N.E.2d 643 (1995).

{¶45} When an ineffective assistance claim is predicated upon the failure to submit a motion to suppress particular evidence, "an appellant must point to evidence in the record showing there was a reasonable probability the result of [the] trial would have differed if the motion had been filed or pursued." *State v. Gaines*, 11th Dist. Lake Nos. 2006-L-059 and 2006-L-060, 2007-Ohio-1375, ¶ 17. "'Hence, to establish prejudice, an appellant must prove more than a mere possibility that the motion could have been granted; rather, he or she must show a *reasonable probability* that, but for the omission, the result of the proceedings would have been different.'" (Emphasis sic.) *State v. Allen*, 11th Dist. Lake No. 2011-L-157, 2013-Ohio-434,¶ 17, quoting *State v. DelMonico*, 11th Dist. Ashtabula No. 2003-A-0022, 2005-Ohio-2902, ¶ 20.

{¶46} Appellant contends that trial counsel deprived him of effective assistance of counsel by failing to move to suppress the video recording of Appellant's interview with Detective Altiere. Appellant specifically argues that he was prejudiced by the admission of his interview because he "admitted to taking a suboxone strip" and "appeared to be under the influence during his interview."

{¶47} There is nothing in this record that demonstrates Appellant was "under the influence" during his interview with Detective Altiere. Appellant has not demonstrated there was a reasonable probability that the result of the proceedings would have differed if a motion to suppress had been filed or pursued. Appellant does not point to any reason why he was prejudiced by the interview's admission into evidence or that a motion to

15

suppress, if filed, would have been granted. Appellant only argues that his stating that he had taken a suboxone strip "painted" him in a "negative light." He provides nothing more to substantiate his claims that his statement prejudiced him before the jury. Trial counsel's failure to file a motion to suppress did not fall below an objective standard of reasonableness.

{¶48} Appellant's second assignment of error is without merit.

{¶49} **Third assignment of error: "The trial court erred in permitting the prosecution to elicit prejudicial testimony by leading a witness."**

{¶50} "A leading question is 'one that suggests to the witness the answer desired by the examiner.'" *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 149, quoting 1 McCormick, Evidence, 19, Section 6 (5th Ed.1999). Pursuant to Evid.R. 611(C), with certain exceptions, "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." "[T]he trial court has discretion to allow leading questions on direct examination." *Diar* at ¶ 149, quoting *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 138; *State v. D'Ambrosio*, 67 Ohio St.3d 185, 190, 616 N.E.2d 909 (1993). Thus, we generally review the trial court's permitting leading questions for an abuse of discretion.

{¶51} However, at trial, Appellant did not object to the question he now challenges. Accordingly, he has forfeited all argument aside from plain error.

{¶52} Crim.R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "To prevail under the plain-error standard, a defendant must show that an error occurred, that

16

it was obvious, and that it affected his substantial rights." *State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, 63 N.E.3d 93, ¶ 62. The requirement that the error must have affected substantial rights means that the error must have affected the outcome of trial. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22. "We take '[n]otice of plain error * * * with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *Obermiller* at ¶ 62, quoting *State v. Long*, 53 Ohio St.2d 91, 97, 372 N.E.2d 804 (1978).

{¶53} Appellant argues that the trial court erred in allowing the State to ask a leading question to Christine Barr, and admitting her answer into evidence. The alleged leading question occurred when Barr testified to her conversation with Appellant regarding the victim's death. The State asked Barr: "Do you remember [Appellant] winking at you?"

{¶54} Under a plain error review, the court's allowing the question to be asked did not affect the trial's outcome. Ms. Barr's testimony that Appellant winked at her when saying he did not cause the victim's death was not outcome determinative. There was other adequate evidence on which the jury could have relied to find that Appellant murdered the victim. Three witnesses testified that they were at Appellant's house when the victim was shot and that Appellant was the only one holding a gun. Melissa Mack testified that she witnessed Appellant shooting the victim. The trial court therefore did not commit plain error in allowing the State to ask the question because there was other evidence on which to convict Appellant and Barr's answer to the question did not affect the trial's outcome.

{¶55} Appellant's third assignment of error is without merit.

Case No. 2023-T-0012

{¶56} **Fourth assignment of error: "There is insufficient evidence to sustain Appellant's conviction for abuse of a corpse."**

{¶57} "'Sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the [factfinder] or whether the evidence is legally sufficient to support the [factfinder's] verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), citing Black's Law Dictionary (6 Ed.1990) 1433. The appellate court's standard of review for sufficiency of evidence is to determine, after viewing the evidence in a light most favorable to the prosecution, whether a rational trier of fact could find the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶58} When evaluating the sufficiency of the evidence, we do not consider its credibility or effect in inducing belief. *Thompkins* at 387. Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law. *Id.* This naturally entails a review of the elements of the charged offense and a review of the State's evidence. *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13.

{¶59} R.C. 2927.01(B), Gross Abuse of a Corpse, provides: "No person, except as authorized by law, shall treat a human corpse in a way that would outrage reasonable community sensibilities."

{¶60} R.C. 2927.01(B) "proscribes a broad range of conduct provided that it is so inappropriate and insensitive as to outrage community standards." *State v. Condon*, 152 Ohio App.3d 629, 2003-Ohio-2335, 789 N.E.2d 696, ¶ 52 (1st Dist.).

18

**{¶61}** "Evidence of an attempt to conceal a body is sufficient to sustain a conviction for gross abuse of a corpse." *State v. Whitaker*, 169 Ohio St.3d 647, 2022-Ohio-2840, 207 N.E.3d 677, ¶ 80; see *State v. Bridges*, 8th Dist. Cuyahoga No. 100805, 2014-Ohio-4570, ¶ 63-64 (victim's body thrown into a pond after being tied to a metal pipe and a cinder block); *State v. Nobles*, 106 Ohio App.3d 246, 267, 665 N.E.2d 1137 (2d Dist.1995) (victim's body kept in a closet for several days before being placed in a dumpster).

**{¶62}** However, an affirmative step to conceal a body is not an element of the crime. *Whitaker* at ¶ 82; see *State v. Warfel*, 9th Dist. Medina No. 16CA0062-M, 2017-Ohio-5766, ¶ 22-24 (a defendant's failure to report victim's death and failure to properly handle the remains was sufficient evidence for the trier of fact to determine that the defendant had abused the corpse).

**{¶63}** Appellant first contends that "there is a total lack of evidence" as to his "involvement in the dumping of the body." Appellant correctly observes that the State did not offer any *direct evidence* that he moved the victim's body. Yet, "[c]ircumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus.

**{¶64}** Circumstantial evidence is not based on personal knowledge or observation, but on "facts from which inferences are drawn, showing indirectly the facts sought to be established." *State v. Blazo*, 11th Dist. Lake No. 2019-L-094, 2020-Ohio-4636, citing *State v. Nicely*, 39 Ohio St.3d 147, 150, 529 N.E.2d 1236 (1988). Where a conviction is based on circumstantial evidence, "that evidence must prove collateral facts

19

and circumstances, from which the existence of a primary fact may be rationally inferred according to common experience." *State v. Windle*, 11th Dist. Lake No. 2010-L-033, 2011-Ohio-4171, ¶ 34.

{¶65} In this case, the circumstantial evidence could lead a reasonable jury to conclude Appellant moved the body in the woods. There is overwhelming evidence upon which a jury could make that inference. There was testimony that: Appellant shot and killed the victim in *his* house. Appellant asked Melissa Mack to move the victim's vehicle. Appellant later set his own house on fire to cover up blood stains. Appellant continuously acted in a manner to conceal his part in the victim's death. None of the witnesses testified that Appellant had asked anyone else to move the body. Other than Appellant's mother, with whom he resided, there was no evidence that anyone else had access to the home. The circumstantial evidence is consistent with the conclusion that Appellant moved the body. Considering all the collateral facts and circumstances, the State presented sufficient evidence for a reasonable jury to conclude, beyond a reasonable doubt, that Appellant had the opportunity and motive to, and did in fact, move the victim's body to the woods where she was found.

{¶66} Appellant also argues leaving a corpse in the woods is not treating the corpse in a way that would outrage reasonable community sensibilities. Dr. Sterbenz testified that the victim's body began putrefaction, including discoloration and deterioration. Due to being left in the woods, the victim's body had become infested by maggots, which caused the victim further deterioration. Dr. Sterbenz stated that the maggots had eaten through the victim's body and caused a "perforated appearance to the skin." Appellant contends that he did not abuse a corpse because he did not "summon

20

the maggots."  But, Appellant left the body in the woods, where she was exposed to maggots.  There was sufficient evidence to show that Appellant had left the victim's body in such a state (as to subject her to maggot infestation) that was "so inappropriate and insensitive as to outrage community standards."

{¶67}  Appellant's fourth assignment of error is without merit.

{¶68}  **Fifth assignment of error: "Appellant's convictions are against the manifest weight of the evidence * * *."**

{¶69}  "When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered."  *In re Z.C.*, 173 Ohio St.3d 359, 2023-Ohio-4703, 230 N.E.3d 1123, ¶ 14.  "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact."  *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 21.  The trier of fact is the sole judge of the weight of the evidence and the credibility of the witnesses.  *State v. Landingham*, 11th Dist. Lake No. 2020-L-103, 2021-Ohio-4258, ¶ 22, quoting *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶70}  "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the [factfinder] is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."  *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).  The trier of fact may believe or disbelieve

21

any witness in whole or in part, considering the demeanor of the witness and the manner in which a witness testifies, the interest, if any, of the outcome of the case and the connection with the prosecution or the defendant. *Id.*, quoting *Antil* at 67.

{¶71} "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App. 3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983).

{¶72} Appellant only argues under his fifth assignment that his conviction for Murder was against the manifest weight of the evidence.

{¶73} R.C. 2903.02(A) provides: "No person shall purposely cause the death of another * * *."

{¶74} "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A).

{¶75} Appellant's conviction for Murder was not against the manifest weight of the evidence. Three witnesses testified that they were at Appellant's house on September 27, 2021. They all testified that Appellant was arguing with the victim and threatening her because he believed she had taken his "dope." All three witnesses testified that they saw Appellant grab the victim and pull her back into the kitchen. Two witnesses testified that once Appellant and the victim entered the kitchen, they heard a gunshot. One witness, Melissa Mack, testified that she was in the kitchen and saw Appellant shoot the victim, causing her body to drop to the floor. The three witnesses testified that Appellant was the only one in the house holding a gun. Kayla Mathey testified that Appellant admitted

22

to her that he murdered the victim and told Mathey "it's all right, she got what she deserved."

{¶76} Appellant argues that the witness testimony was unreliable because "[a]lmost every fact witness was a drug user who was either high, dope sick, or in jail." Each witness that was a drug user testified that they used drugs. Melissa Mack even admitted to taking crack cocaine the morning of her testimony. But, the jury, as factfinder, heard all evidence and testimony at trial, and was free to believe or disbelieve any testimony and to determine witness credibility.

{¶77} Upon review, this is not the exceptional case in which the evidence weighs heavily against the conviction.

{¶78} Appellant's fifth assignment of error is without merit.

{¶79} The judgment of the Trumbull County Court of Common Pleas is affirmed.


MARY JANE TRAPP, J.,

ROBERT J. PATTON, J.,

concur.

Case No. 2023-T-0012